# STATE ADMINISTRATIVE BOARD OF ELECTION LAWS ET AL. *v.* CALVERT

[No. 133 (Adv.), September Term, 1974.]

*Per Curiam Order August 23, 1974.*

*Opinion Filed October 10, 1974.*

660

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, LEVINE and O'DONNELL, JJ., and CHARLES E. ORTH, JR., Chief Judge of the Court of Special Appeals and JERROLD V. POWERS, Associate Judge of the Court of Special Appeals, specially assigned.

*George A. Nilson, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellants.

*Roger D. Redden,* with whom were *Francis X. Wright* and *Piper & Marbury* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

We shall here give our reasons for reversing the decree of a trial court by our per curiam order of August 23, 1974. In so doing, we must present the answers to four questions: (1) the validity of our provision that in a legislative district of more than two counties no county shall have more than one delegate residing in it, a provision applicable by its terms to Legislative District 34, a district of three counties; (2) whether this provision runs counter to the provisions of Maryland Constitution art. III, § 9 relative to residence; (3) whether the name of an individual who is the sole candidate from his county for nomination by his party to the House of Delegates in a three-county district must be printed upon the primary election ballot of that party; and (4) whether because of the grant by Constitution art. III, § 5 to this Court of original jurisdiction to review the legislative districting of the State the trial court had jurisdiction to entertain an attack upon the constitutionality of the legislative districting plan.

i

### History of the Litigation

Appellee, William B. Calvert (Calvert), a candidate for the Democratic nomination for the House of Delegates residing in Cecil County, filed a petition in the Circuit Court for Cecil County on August 9, 1974, in which he challenged that portion of the order of this Court in *In re Legislative Districting*, 271 Md. 320, 317 A. 2d 477 (1974), which provided:

> "(D) In any legislative district which contains more than two counties or parts of more than two counties, and where Delegates are to be elected at large by the voters of the entire district, no county, or part of a county, shall have more than one Delegate residing in it."

He likewise challenged an application of that order under an opinion of the Attorney General of Maryland issued on July 19, 1974, in which it was concluded that the names of candidates who, by reason of their residence, were unopposed and thus assured of nomination should not be included on the primary election ballot.

Named as respondents were the individuals constituting the Board of Supervisors of Elections for Cecil County, the individuals constituting the State Administrative Board of Election Laws, and the State Administrator of Election Laws. Calvert prayed a permanent injunction:

> "(a) forbidding Respondents from taking any action toward ordering, directing, authorizing, or permitting the preparation or printing of any primary election ballots or 'Special Instructions' which [would] advise or instruct the voters of Legislative District 34 that only one resident of Cecil County [might] be nominated for election to the Maryland House of Delegates," and
>
> "(b) directing Respondents to prepare ballots

which [would] list all the candidates who [sought] nomination for election to the Maryland House of Delegates from Legislative District 34, and which [would] allow the voters to vote for three (3) candidates for said nomination . . . ."

The matter came on for hearing in that court on August 14. The chancellor (Mackey, J.) filed his opinion on August 16. He ordered that ballots be prepared "which list[ed] all the candidates who [sought] nomination for election to the Maryland House of Delegates from Legislative District 34 and which [would] allow the voters to vote for three (3) candidates for said nomination . . . ." He enjoined the respondents "from taking any action toward ordering, directing, authorizing, or permitting the preparation or printing of any primary election ballots or 'Special Instructions' which [would] advise or instruct the voters of Legislative District 34 that only one (1) resident of Cecil County [might] be nominated for election to the Maryland House of Delegates."

The State Administrative Board of Election Laws and the State Administrator of Election Laws noted an appeal to the Court of Special Appeals on August 19. The parties jointly petitioned us for the writ of certiorari. We granted the writ and set the matter for argument on August 23.

Pursuant to Constitution art. III, § 5, the Governor of Maryland submitted to the General Assembly his proposals for legislative redistricting. When the General Assembly failed to adopt its own plan for legislative redistricting, the Governor's plan became law on February 24, 1973.

We were thrust into the center of the matter of redistricting by the combination of the adoption by the people of Maryland of an amendment to Constitution art. III, § 5 providing that this Court should "have original jurisdiction to review the legislative districting of the State" and the failure of the Governor to hold the public hearings required by the same section of the constitution prior to the submission of his redistricting plan to the General Assembly. Upon challenge to the plan on that basis, we

concluded that the Governor's plan was not validly promulgated. We passed an order to that effect on July 31, 1973.

In the matter of granting "appropriate relief" we were faced with the necessity for finding a point of beginning. Our order specified "that said invalidly promulgated plan [was] . . . adopted by the Court as the plan setting forth the proposed boundaries of the legislative districts for the election of members of the Senate and House of Delegates, unless cause to the contrary [were] shown, as [t]hereinafter provided." We ordered "that public hearings be properly scheduled and held in Annapolis, Maryland before the Honorable Hall Hammond, [former Chief Judge of this Court,] a Special Master" appointed by the same order. We provided for notice throughout the State by publication in newspapers in each county. We ordered "that any registered voter of this State, other than the petitioners in the [then pending] proceedings, who desire[d] to show cause why the said plan, or any part thereof, should not be duly adopted as the final legislative districting plan for this State [should] formally intervene in th[o]se proceedings on or before September 30, 1973 . . . ." Rather than go off on a project of our own, redesigning and redefining the legislative districts of this State, we elected to exercise judicial restraint by changing only those legislative districts which, upon challenge, we found to be constitutionally invalid.

In the plan proposed by the Governor and in the plan promulgated by us, Legislative District 34 consists of the counties of Cecil, Kent, and Queen Anne's. The provision that no county should have more than one delegate residing in it is identical in both plans. It affects only Legislative Districts 34, 35, and 36, made up of the nine counties comprising the Eastern Shore of Maryland, since only those legislative districts contain "more than two counties or parts of more than two counties."

No challenge was made before or after our order of July 31, 1973, to Legislative District 34. Challenge was made to Districts 35 and 36 based upon the division of Wicomico County and the fact that a part of Somerset County was

placed in Legislative District 34 with no means of being reached from other portions of that district by road (other than by use of the ferry at Whitehaven), it being separated from the remainder of the proposed district by unbridged navigable waters. No challenge was made before or after the July 31, 1973, order to the provision relative to residence of delegates until mention was made of the case of *Secretary of State v. Bryson,* 244 Md. 418, 224 A. 2d 277 (1966), which we shall later discuss, in a motion for reargument filed by residents of the western part of Wicomico County who objected to being separated from the remainder of that county by being placed in Legislative District 35.

ii

## Area Involved

The area under discussion can be best understood by reference to a copy of a portion of the Maryland 1974 official highway map appended to this opinion which the reporter is directed to reproduce.

Cecil County, the northernmost of the three counties, had a 1970 population as shown by the census of that year of 53,291, mostly concentrated north of the Chesapeake and Delaware Canal since that census reflects a total of but 6,010 people residing in its two southernmost election districts, Chesapeake City and Cecilton. It is divided from Kent County by the Sassafras River and its tributaries from the Chesapeake Bay to the Delaware State line. There are but three roads between the two counties. The main road is that which crosses the Sassafras by a drawbridge between Georgetown and Fredericktown. U. S. Route 301, of recent construction, is a limited-access highway which crosses the upper reaches of the Sassafras. The third point is a road between the village of Sassafras in Kent County and the crossroads of Ginns Corner in Cecil County.

Kent County, the middle county, had a 1970 population of 16,146, of which more than a fourth (4,209) were located in the Chestertown election district, the county seat, and 2,889 in the Edesville district, which includes the town of Rock

Hall on the Chesapeake Bay. From the Chesapeake Bay to the Delaware State line, Kent County is separated from Queen Anne's County by the Chester River. There are but four points of contact between the two counties, with the principal point being via the drawbridge at Chestertown. U. S. Route 301 also connects these two counties. There are other river crossings at Crumpton and at Millington.

Queen Anne's County, the southernmost county, had a 1970 population of 18,422, with the heaviest concentration being in the Kent Island and Queenstown election districts with a total of 7,728 people. The Centreville election district, the county seat, had 3,564 people.

The peculiar geography of the Eastern Shore of Maryland, cut as it is by navigable streams, may well be the reason for the insertion into the Governor's Plan of the provision relative to residence, since further examination of relevant maps will reveal that although Talbot and Caroline Counties adjoin and are in the same legislative district, there are but three points of connection, fixed bridges at Hillsboro and New Bridge across the Tuckahoe, and a drawbridge across the Choptank at Dover Bridge; and although Talbot and Dorchester Counties adjoin, their only connection is the mile-long drawbridge across the Choptank at Cambridge opened in the late 1930's. Prior to that there was no connection. Dorchester and Wicomico Counties border each other from the Chesapeake Bay to the Delaware line, being divided by Holland Strait, Tangier Sound, and the Nanticoke River, with the only road connections being drawbridges at Vienna and Sharptown across the Nanticoke.

iii

Validity of the Plan

Calvert contends "that the application of a county residency requirement to the nomination of candidates for election to the House of Delegates from Legislative District 34 would result in a patent violation of the one-man one-vote principle articulated by the Supreme Court in *Reynolds v.*

*Sims* [, 377 U. S. 533, 84 S. Ct. 1362, 12 L.Ed.2d 506 (1964),] and its progeny, and that this Court's decision in *Secretary of State v. Bryson,* 244 Md. 418 [, 224 A. 2d 277] (1966), presenting an indistinguishably similar attempt to compromise the one-man one-vote principle, has not been diluted or abrogated since 1966 and is dispositive of this case." The trial judge concluded that since Cecil County has 61% of the population, Queen Anne's County 21% of the population, and Kent County 18% of the population, permitting "each County [to] elect one delegate . . . does not approximate the concept of one man — one vote" and is an "invidiously wide disparity in population."

In *Bryson,* Maryland Code (1957) Art. 40, § 42E (A-2), as repealed and re-enacted by Chapter 2 of the Acts of the Special Session of 1965, provided that in any senatorial district "comprising more than one county and having two Senators, not more than one resident of any one county [might] be nominated by one political party at the primary election, unless the population of that one county exceed[ed] the population of all the remaining counties in the district in the aggregate." It was further provided that any senatorial candidate had to be voted upon at large within the entire district at the primary election and that the provisions of the subsection should not apply to general elections for the office of state senator. Two state senators were to be elected from District 2, composed of Frederick and Carroll Counties. In the Republican primary the two candidates receiving the highest number of votes were both from Carroll County. Since Frederick County by the 1960 census had a population of 71,930 to Carroll County's 52,785, only one Republican candidate resident in Carroll County could be nominated if the section were valid. Upon the strength of *Davis v. Dusch,* 361 F. 2d 495, 497 (4th Cir. 1966), this Court observed that "it is the distribution of representatives rather than the method of distributing them that must satisfy the demands of the Equal Protection Clause." It said *Fortson v. Dorsey,* 379 U. S. 433, 85 S. Ct. 498, 13 L.Ed.2d 401 (1965), and *Reed v. Mann,* 237 F. Supp. 22 (N.D. Ga. 1964), were not apposite since in each case "there was no allegation or

evidence that the districts were unequal as to population." Judge Oppenheimer said for the Court:

> "The invalidity of the Section, under the one-man one-vote principle, is clear. Frederick and Carroll Counties have populations in the respective approximate proportions of 7 to 5. Under the operation of the Section, Frederick County could have two nominees in the primary of one party while Carroll County would have none." *Id.* at 428.

Believing, as it was put in *Herring v. Christensen*, 252 Md. 240, 242, 249 A. 2d 718 (1969), that "consistency and stability in this Court's rulings . . . are necessary for our citizens to know their respective rights and obligations," that the General Assembly is the branch of government vested with legislative power, and that that body at its periodic meetings by appropriate legislation can take steps to alter a decision of ours with which it may disagree, this Court has consistently adhered to the doctrine of stare decisis. We do not feel bound under that doctrine by the decision in *Bryson*, however, because that case involved a determination based upon the Court's understanding of what the Supreme Court of the United States had held by way of an interpretation of the Constitution of the United States after its revolutionary holdings in *Baker v. Carr*, 369 U. S. 186, 82 S. Ct. 691, 7 L.Ed.2d 663 (1962), and *Reynolds v. Sims*, 377 U. S. 533, 84 S. Ct. 1362, 12 L.Ed.2d 506 (1964). By the decisions of that Court since *Bryson* we have been provided with additional light and, therefore, view the matter somewhat differently.

As has been noted, the decision in *Bryson* relied upon *Davis v. Dusch, supra.* That decision was reversed in *Dusch v. Davis*, 387 U. S. 112, 87 S. Ct. 1554, 18 L.Ed.2d 656 (1967), decided after *Bryson. Dusch* involved election of a city council for Virginia Beach. After a United States District Court had held the allocation of members of the city council invalid as denying voter equality, the city charter was amended. The council was composed of 11 members. Four were elected at large without regard to residence. Seven

were elected by the voters of the entire city, one being required to reside in each of the seven boroughs. The population of the boroughs ranged from a low of 733 to a high of 29,048. Mr. Justice Douglas there said for the Court:

"The fact that each of the seven councilmen must be a resident of the borough from which he is elected, is not fatal. In upholding a residence requirement for the election of state senators from a multi-district county we said in *Fortson v. Dorsey*, 379 U. S. 433, 438:

'It is not accurate to treat a senator from a multi-district county as the representative of only that district within the county wherein he resides. The statute uses districts in multi-district counties merely as the basis of residence for candidates, not for voting or representation. Each district's senator must be a resident of that district, but since his tenure depends upon the county-wide electorate he must be vigilant to serve the interests of all the people in the county, and not merely those of people in his home district; thus in fact he is the county's and not merely the district's senator.'

"By analogy the present consolidation plan uses boroughs in the city 'merely as the basis of residence for candidates, not for voting or representation.' He is nonetheless the city's, not the borough's, councilman. In *Fortson* there was substantial equality of population in the senatorial districts, while here the population of the boroughs varies widely. If a borough's resident on the council represented in fact only the borough, residence being only a front, different conclusions might follow. But on the assumption that *Reynolds v. Sims* controls, the constitutional test under the Equal Protection

Clause is whether there is an 'invidious' discrimination." *Id.* at 115-16.

\* \* \*

"The Seven-Four Plan seems to reflect a detente between urban and rural communities that may be important in resolving the complex problems of the modern megalopolis in relation to the city, the suburbia, and the rural countryside. Finding no invidious discrimination we conclude that the judgment of the Court of Appeals must be and is

*Reversed.*"

*Id.* at 117.

Although Mr. Justice Douglas in *Davis* said that "there was substantial equality of population in [the] senatorial districts" in *Fortson,* we note that in his dissent in *Fortson* he referred to the three senatorial districts in DeKalb County, stating that "District 41 contain[ed] 75,117 voters," that "District 42 contain[ed] 95,032 voters," and that "District 43 contain[ed] 86,633 voters." The contest in *Fortson* was directed not at population disparity, but at the validity of a plan under which 33 senatorial districts were made up of from one to eight counties with senators elected on a district-wide basis and the remaining 21 senatorial districts were allotted in groups of from two to seven among the seven most populous counties, with senators elected on a county-wide basis rather than on a district-wide basis. A three-judge court had held this to be "a discrimination as between voters in the two classes." The Supreme Court reversed. If one were to think of our Legislative District 34 as being a Georgia county required to elect a representative from each of the subdistricts comprising Cecil, Kent, and Queen Anne's Counties but on a district-wide basis, one would have an analogous situation to that ruled upon and upheld in *Fortson.*

In *Mahan v. Howell,* 410 U. S. 315, 321, 93 S. Ct. 979, 35 L.Ed.2d 320 (1973), the Court referred to its statement in

*Reynolds v. Sims,* 377 U. S. 533, 84 S. Ct. 1362, 12 L.Ed.2d 506 (1964):

> "A consideration that appears to be of more substance in justifying some deviations from population-based representation in state legislatures is that of insuring some voice to political subdivisions, as political subdivisions. Several factors make more than insubstantial claims that a State can rationally consider according political subdivisions some independent representation in at least one body of the state legislature, as long as the basic standard of equality of population among districts is maintained. Local governmental entities are frequently charged with various responsibilities incident to the operation of state government. In many States much of the legislature's activity involves the enactment of so-called local legislation, directed only to the concerns of particular political subdivisions. And a State may legitimately desire to construct districts along political subdivision lines to deter the possibilities of gerrymandering. However, permitting deviations from population-based representation does not mean that each local governmental unit or political subdivision can be given separate representation, regardless of population." 377 U. S. at 580-81.

In *Mahan* a three-judge United States District Court had struck down the apportionment of the Virginia House of Delegates because of a 16.4% variation from the ideal district population, variances which the district court noted were traceable to the desire of the General Assembly to maintain the integrity of traditional county and city boundaries. With one exception, the delegate districts followed political jurisdictional lines of the counties and cities. That exception, Fairfax County, was allotted 10 delegates, but was divided into two five-member districts. The Court said in *Mahan*:

"We are not prepared to say that the decision of the people of Virginia to grant the General Assembly the power to enact local legislation dealing with the political subdivisions is irrational. And if that be so, the decision of the General Assembly to provide representation to subdivisions *qua* subdivisions in order to implement that constitutional power is likewise valid when measured against the Equal Protection Clause of the Fourteenth Amendment. The inquiry then becomes whether it can reasonably be said that the state policy urged by Virginia to justify the divergences in the legislative reapportionment plan of the House is, indeed, furthered by the plan adopted by the legislature, and whether, if so justified, the divergences are also within tolerable limits. For a State's policy urged in justification of disparity in district population, however rational, cannot constitutionally be permitted to emasculate the goal of substantial equality." *Id.* at 325-26.

The Court held:

"The policy of maintaining the integrity of political subdivision lines in the process of reapportioning a state legislature, the policy consistently advanced by Virginia as a justification for disparities in population among districts that elect members to the House of Delegates, is a rational one. It can reasonably be said, upon examination of the legislative plan, that it does in fact advance that policy. The population disparities that are permitted thereunder result in a maximum percentage deviation that we hold to be within tolerable constitutional limits. We, therefore, hold the General Assembly's plan for the reapportionment of the House of Delegates constitutional and reverse the District Court's conclusion to the contrary." *Id.* at 329-30.

Kent County has adopted the home rule provisions

provided by Maryland Constitution art. XI-F and Code (1957, 1973 Repl. Vol.) Art. 25B. *Maryland Manual 1973-1974,* 465 (1974). Neither Cecil County nor Queen Anne's County has home rule, thus necessitating the enactment of local legislation for those counties by the General Assembly. In fact, the voters of Cecil County rejected home rule at a referendum on the subject. The governmental powers and functions of the counties of Maryland were set forth for this Court by Judge Henderson in *Maryland Committee v. Tawes,* 229 Md. 406, 412, 184 A. 2d 715 (1962). Judge Barnes in his dissenting opinion in *Hughes v. Maryland Committee,* 241 Md. 471, 498-503, 217 A. 2d 273 (1966), correctly reviewed the functions of counties in greater depth.

To say that a delegate elected by the voters of all three counties but required for election to reside, for instance, in Kent County will be concerned only with the interest of Kent County in the General Assembly is to pay little heed to the realities of political life. Since he is elected by all of the voters in the district, it seems safe to say that one who sees fit to ignore a substantial portion of his constituency undoubtedly will be rebuked when he is next obliged to face the electorate.

Historically, the lower house of legislative bodies has been the one with the larger membership and regarded as closer to the people. Political scientists have taught that it is for precisely that reason that appropriations bills in the Congress of the United States must originate in the House of Representatives.

The General Assembly when it convenes in January, 1975, will not have members elected on a county basis for the first time since the adoption of the Constitution of 1776. *See generally* J. Michener, *The History of Legislative Apportionment in Maryland,* 25 Md. L. Rev. 1 (1965).

As we have previously indicated, the geography of this area is unusual. We believe that there is a legitimate state interest in scattering the delegates through the legislative district in such manner that no voter will be far removed from a delegate. Without this provision it would be entirely possible for all three delegates to be concentrated in the

uppermost regions of Cecil County in an area where the travel time by automobile from, for instance, Stevensville or Queen Anne in Queen Anne's County would be in excess of one hour each way.

With the insight provided by *Dusch* and *Mahan* and relying upon the rational bases set forth by the Supreme Court in *Reynolds* and *Fortson*, we overrule *Bryson* and hold the district validly established.

iv
## Residence Clause of Constitution

### Article III, § 9

Calvert suggests that if we see fit to reverse the chancellor on the constitutionality of the legislative districting plan, as we have, that nevertheless the plan is not consistent with the provisions of Constitution art. III, § 9 which provides in pertinent part:

> "No person shall [be] eligible as a Senator or Delegate, who at the time of his election, is not a citizen of the State of Maryland, and who has not resided therein, for at least three years, next preceding the day of his election, and the last year thereof, in the County, or in the Legislative District of Baltimore City, which he may be chosen to represent, if such County, or Legislative District of said City, shall have been so long established; and if not, then in the County, or City, from which, in whole, or in part, the same may have been formed . . . ."

Calvert says:

> "The Attorney General has opined that, as applied to a candidate in a legislative district comprised of more than one county, this provision simply means that 'the candidate must have resided in that portion of the county which is a part of the . . . district which he aspires to represent.' 51 Op. A.G. 82, 83 (1966), quoted in *Hillyard v. Board*

*of Supervisors of Elections,* 259 Md. 150, 155 (1970). The residency restriction which Appellants seek to enforce requires that a candidate not only reside within a county of the legislative district which he seeks to represent, but also that he receive more votes than any other candidate residing in the same county in order to be nominated or elected in an alleged 'at large' election. This would impose an additional residency restriction on the eligibility of some candidates for election to the General Assembly not authorized by the pertinent constitutional provision."

He further states, correctly:

"Section 3 of Article III of the Maryland Constitution authorizes the creation of the three types of legislative districts: (1) those in which all candidates are elected at large, (2) those in which each candidate is elected from a single-member subdistrict, and (3) those in which one candidate is elected from a single-member subdistrict while the others are elected from a multi-member subdistrict."

Calvert sees this as at variance with the districting plan. We do not see it that way. In *Hillyard v. Board of Elections,* 259 Md. 150, 269 A. 2d 42 (1970), we held, relative to an individual seeking to run for the House of Delegates in Montgomery County who had resided within that county for a year but had not lived in the legislative district for a year, that the constitutional requirement was that he be a resident of the county for the required time, and, thus, he was eligible to run. The requirement here is in accord with that holding.

v

## The Ballot

Since the chancellor ruled that candidates for the House of Delegates should be elected without regard to residence, it

was not necessary for him to consider the issue raised relative to the validity of the ballot as set up pursuant to the instructions of the Attorney General. Since only one resident of Kent County filed for the Democratic nomination to the House of Delegates, the Attorney General said that that candidate's name should not appear on the primary ballot. Special instructions to the voters in the legislative district were suggested, which instructions are reproduced as an appendix to this opinion. Calvert claims this is "incorrect in that it (1) fails to list the candidate from Kent County and (2) instructs the voters that they may vote for only two candidates." We do not see it that way. A primary election is merely an officially supervised party nominating procedure. It appears to have been unknown in Maryland prior to the first decade of this century. *See Hennegan v. Geartner*, 186 Md. 551, 47 A. 2d 393 (1946), and *Kenneweg v. Allegany County*, 102 Md. 119, 62 A. 249 (1905). In *Jackson v. Norris*, 173 Md. 579, 195 A. 576 (1937), this Court held that voting machines must be so constructed and arranged as to permit an individual to cast a vote for a candidate whose name did not appear on the official ballot but said "that the right is not applicable to primary elections . . . ." In *Supervisors of Elections v. Blunt*, 200 Md. 120, 88 A. 2d 474 (1952), the writ of mandamus was sought to compel "the write-in slots on the voting machines of Baltimore City [to be] unlocked for the Primary Election to be held on May 5, 1952 so as to give the voters at said Primary Election an opportunity to write on the ballot and mark in the proper place the name of any person other than those printed on the ballot." In an opinion by Judge Henderson this Court said that "the write-in privilege was never applicable to primary elections, and, indeed, is inconsistent with the whole theory of primary elections." The election laws were extensively revised by Chapter 739 of the Acts of 1957. At that time there was written into the law a provision, now found in Code (1957, 1971 Repl. Vol.) Art. 33, § 5-3 (d), specifically providing that "[t]here shall be no names of candidates written in at primary elections," thus recognizing the decision in *Blunt*.

The fact that primary elections are a party matter for the selection of candidates was set forth for this Court by Chief Judge Marbury in *Hennegan v. Geartner, supra.* In that case Geartner took issue with the provision of law, now embodied in Code (1957, 1971 Repl. Vol., 1973 Cum. Supp.) Art. 33, § 3-8 (b), specifying when one might change his party affiliation. Judge Marbury there said for the Court:

> "Primaries are provided only for majority parties. Those belonging to minor parties must nominate their candidates by convention or petition (Article 33, Sections 32, 33, and 34). No individual may become an independent candidate at the general election who has been a candidate for nomination by a political party in a primary preceding the general election at which he desires to stand for office. Article 33, Section 34. No one can file as a candidate for a party unless he is affiliated with that party. Article 33, Section 49. An exception is made to this last rule for those seeking the office of judge.

> "All of the provisions above quoted and referred to indicate the intention of the Legislature to restrict voting at a primary to those who legally and properly belong to the party for which the primary is held. If this can be lawfully done, the permission to a comparatively small number of voters (new and declined) to join a party within six months of the primary, and to participate in the primary, could not invalidate a general provision designed to carry out a lawful intention. The right given them might even be upheld on the doctrine of *de minimis*, but it is not necessary to invoke this. The direct primary is a creature of the Legislature, designed for the purpose of permitting the members of a party to select their candidates under official supervision and control. According to its history and interpretation in this State, it is substituted for conventions or meetings of voters. Such conventions or meetings were always

restricted to those belonging to the parties by whom they were held, and so the direct and official primary is so restricted." *Id.* at 558.

Code (1957, 1971 Repl. Vol.) Art. 33, § 5-3 (c) provides:

"Whenever only one candidate of any such political party for such public office or position has so qualified to have his name so placed upon the official primary election ballot at the expiration of the time allowed, his name and the name of the position for which he is a candidate shall be omitted from the said official ballot, so that the official ballot of such political party shall contain only the names of such candidates for positions, offices, or delegates where there are qualified contestants for such positions."

It is clear to us that the individual seeking the Democratic nomination for the House of Delegates who resided in Kent County comes within the purview of that statute because he was the only resident of Kent County who sought the Democratic nomination. Accordingly, his name should not have been placed on the primary election ballot.[1]

vi

Jurisdiction

Appellant suggests that the trial court lacked jurisdiction to entertain the constitutional challenge since this Court has exclusive original jurisdiction in such cases. We agree. Constitution art. III, § 5 provides for the manner of establishing plans for the legislative districts of the State. It then provides in pertinent part:

"Upon petition of any registered voter, the Court

---

[1]. We are not obliged for the purposes of this opinion to reach the question that might arise in a legislative district having more than three counties if residents of more than three counties filed for a party nomination. Obviously, if residents of only three counties filed for a party nomination § 5-3 (c) would be applicable.

of Appeals shall have original jurisdiction to review the legislative districting of the State and may grant appropriate relief, if it finds that the districting of the State is not consistent with requirements of either the Constitution of the United States of America, or the Constitution of Maryland."

We have often lamented the absence of legislative history as an aid to the interpretation of Maryland constitutional and statutory provisions. In this instance, however, we have legislative history.

Prior to the constitutional amendment proposed by Chapter 785 of the Acts of 1969 and ratified by the people on November 3, 1970, no reference was made in the Constitution to a redistricting plan to be proposed by the Governor or to the jurisdiction of this Court. It provided simply for a House of Delegates of 123 delegates with allocations to the counties of Maryland and the legislative districts of Baltimore City. The constitutional amendment proposed by Chapter 363 of the Acts of 1972 and ratified by the people at the general election in 1972 had changes in § 5 brought about by its changes to §§ 2, 3, and 4, but it contained no change in the manner of formulating a legislative districting plan or in the matter of our original jurisdiction.

Governor J. Millard Tawes appointed a Constitutional Convention Commission on June 16, 1965, and instructed it "to conduct an inquiry into the necessity for, and extent and nature of any amendment, modification or revision of the Constitution of Maryland, with particular respect to whether a Constitutional Convention should be held, the procedures for calling such a convention, the basis for representation at the Convention and the procedures for the election of the delegates thereto." *Report of the Constitutional Convention Commission* vii (1967). In its report that Commission provided a draft constitution, § 3.03 of which stated:

"Within three months after official publication of

the population figures of each decennial census of the United States, the governor shall present to the General Assembly plans of congressional districting and legislative districting and apportionment. If the General Assembly is not in session, the governor shall convene a special session. The General Assembly shall by law enact plans of congressional districting and legislative districting and apportionment. If no plan has been enacted for any one or more of these purposes within four months prior to the final date for the filing of candidates for the next general election occurring after publication of such census figures, then the pertinent plan as presented to the General Assembly by the governor shall become law. Upon petition of any qualified voter, the Supreme Court shall have original jurisdiction to review the congressional districting and legislative districting and apportionment of the State and grant appropriate relief, if it finds that any of them does not fulfill constitutional requirements." *Id.* at 128.

In the suggested constitution the highest court of the State was known as the "Supreme Court." The Commission commented in its report upon the above suggestion for review of legislative districting by the State's highest court:

"The Commission further recommends that the Supreme Court of Maryland have original jurisdiction to review any plan upon the petition of any eligible voter and be empowered to grant appropriate relief. Thus, the Supreme Court could modify any plan of districting and apportionment, or it could develop a completely new plan. In this way there could be Supreme Court review of the constitutionality of any plans that became law by legislative enactment or of the governor's plans which become law by reason of legislative inaction.

"Original jurisdiction, rather than appellate jurisdiction only, is conferred on the state Supreme

Court in all districting and apportionment cases so that prompt and final settlement of any constitutional issues involved can be made." *Id.* at 128-29.

The people of Maryland at a special election September 13, 1966, expressed their desire to hold a constitutional convention. The General Assembly enacted Chapter 4 of the Acts of 1967 providing for the holding of a convention, the delegates were elected, the Constitutional Convention convened for organization on July 11, 1967, and then proceeded to formally convene for the conduct of its stated purpose on September 12, 1967.[2] The constitution proposed by the Convention called for a redistricting commission composed of nine people, with the presiding officer and the minority leader of the Senate and the House of Delegates each to appoint two persons and the Governor to appoint one person, who was to serve as chairman. No member of the commission was to be an individual who held "a popularly elected office in the State." It further provided in § 3.06:

"The commission on legislative redistricting shall submit a plan to the governor, who shall transmit it to the General Assembly by the first day of the regular session in the year in which redistricting is to be effective. If any other plan has not been prescribed by law within seventy days after the transmission of the commission plan to the General Assembly, then the commission plan shall become law. The Court of Appeals shall have original jurisdiction, upon petition of any qualified voter, to review the new redistricting law and the commission plan if it has not become law. If the Court of Appeals finds a redistricting law enacted by the General Assembly invalid, then the commission plan shall become law. If the Court of Appeals finds the commission plan invalid, then the

---

2. The Honorable J. Millard Tawes, by then a former Governor of Maryland, was a delegate to the Convention from his home county of Somerset and was elected honorary president of the Convention.

Court of Appeals shall grant appropriate relief for the conduct of the impending election."

That provision reached the convention floor in the form of Committee Recommendation No. LB-2 from the Committee on the Legislative Branch. Committee Memorandum No. LB-2 commented on its proposals relative to legislative districting. On the subject of the jurisdiction of this Court to review redistricting plans the committee stated:

"Section 3.03a also provides that the Court of Appeals shall have original jurisdiction to review redistricting plans. The purpose of this provision is to reduce litigation and shorten the time required to dispose of redistricting cases. Since redistricting suits are almost always appealed to the highest state court, it is logical to give the Court of Appeals original jurisdiction and bypass all lower court activity." [3]

The Convention began its consideration of that recommendation on December 1, 1967. A review of the transcript of those proceedings reveals that Delegate Francis X. Gallagher, the Chairman of the Committee on the Legislative Branch, was extensively questioned by various delegates relative to the committee's proposals for legislative redistricting, but not a single question was propounded on the subject of the review by this Court of legislative districting plans.

The long hours spent in attempting to produce a new constitution for the people of Maryland seemed to come to naught when the electorate rejected that proposed document on May 14, 1968. However, the Legislative Council recognized the need for constitutional revision and appointed a Committee on Constitutional Revision. As a result, many of the proposals of the Constitutional Convention have since found their way into the Maryland

---

3. Section 3.03a in the committee proposal became § 3.06 in the proposed constitution.

Constitution in piecemeal fashion. The proposals relative to the Judicial Disabilities Commission and the District Court of Maryland are two examples. It is obvious that the present constitutional provision relative to redistricting stems from the proposed constitution. The similarity to the provisions relative to jurisdiction of this Court can best be comprehended if the present constitutional provision and that proposed by the Constitutional Convention are placed side by side:

Article III, § 5:

"Upon petition of any registered voter, the Court of Appeals shall have original jurisdiction to review the legislative districting of the State and may grant appropriate relief, if it finds that the districting of the State is not consistent with requirements of either the Constitution of the United States of America, or the Constitution of Maryland."

§ 3.06 of the proposed constitution:

"The Court of Appeals shall have original jurisdiction, upon petition of any qualified voter, to review the new redistricting law and the commission plan if it has not become law. If the Court of Appeals finds a redistricting law enacted by the General Assembly invalid, then the commission plan shall become law. If the Court of Appeals finds the commission plan invalid, then the Court of Appeals shall grant appropriate relief for the conduct of the impending election."

The General Assembly which framed the constitutional amendment proposed by Chapter 785 of the Acts of 1969 first giving this Court original jurisdiction in redistricting matters and then framed Chapter 363 of the Acts of 1972 revising the number of seats in the General Assembly, but

leaving unchanged the reference to our jurisdiction, is the same General Assembly which enacted Chapter 528 of the Acts of 1970 relative to the jurisdiction of the District Court found in Code (1957, 1973 Repl. Vol.) Art. 26, § 145. Reference to that and to Code (1974) §§ 4-301, 4-302, and 4-401, Courts and Judicial Proceedings Article, a product of the same General Assembly by the enactment of Chapter 2 of the Acts of the First Extraordinary Session of 1973, will reveal that the General Assembly spoke of concurrent jurisdiction when it meant "concurrent" and spoke of exclusive jurisdiction when it meant "exclusive." Since art. III, § 5 stemmed from the constitution proposed by the Constitutional Convention Commission and that proposed by the Constitutional Convention, the General Assembly must have been aware of the interpretation placed by each of those groups upon the suggested language relative to jurisdiction of this Court. Accordingly, with this legislative history behind it, we conclude that under this constitutional provision this Court and only this Court may consider a challenge to the constitutionality of a legislative districting plan. Therefore, the trial court in this instance was without jurisdiction to consider that portion of Calvert's complaint which claimed the legislative districting plan to be unconstitutional. The question of whether the name of the sole candidate from one of the three counties of the legislative district for the House of Delegates should appear on the primary election ballot did not involve a challenge to the constitutionality of the legislative districting plan. Thus, that question was within the jurisdiction of the trial court.

## SPECIAL INSTRUCTIONS
## TO THE VOTERS IN
## LEGISLATIVE DISTRICT _____
## HOUSE OF DELEGATES ELECTION

Your Legislative District consists of all or part of the following counties:

All of *_____

Part of *_____

The District will be represented by three members of the House of Delegates. In accordance with the Districting Plan adopted by the Court of Appeals, no county or part of a county included in the District may have more than one member of the House of Delegates residing in it. This limitation is applicable to both primary elections and general elections. Notwithstanding this limitation, voting is on an at-large basis and each individual voter may vote for candidates without regard to his residence or the residence of the candidates. Voters may, if they wish, vote for more than one resident of a given county.

The following candidates are unopposed in the primary election, have been declared nominated and their names accordingly do not appear on the primary election ballot but will appear on the general election ballot:

| Democratic Primary * | Republican Primary * |
|---|---|
| X, Resident of X County | A, Resident of X County |
| Y, Resident of Y County | B, Resident of Y County |
| | C, Resident of Z County |

*NOTE: Slight variations in this form will be required for each District.