666 A.2d 1253

**William H. MOSSBURG, Jr., et al.**

v.

**MONTGOMERY COUNTY, Maryland, et al.**

**No. 58, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

Oct. 2, 1995.

Reconsideration Denied Dec. 7, 1995.

**2**

Todd D. Brown (Joseph P. Blocher and Linowes and Blocher, on the brief), Silver Spring, for appellants.

Karen L. Federman Henry, Associate County Attorney (Charles W. Thompson, Jr., County Attorney, and A. Kath-

erine Hart, Senior Assistant County Attorney, on the brief), Rockville, for appellee Montgomery County.

Norman G. Knopf (Dennis M. Cate and Knopf & Brown on the brief), Washington, DC, for appellees Twin Lakes, et al.

William Jensen, Rockville, on the brief, pro se.

Argued before MOYLAN, WENNER and CATHELL, JJ.

CATHELL, Judge.

William H. Mossburg Jr., *et al.*, appeal from an order of the Circuit Court for Montgomery County that affirmed the order of the Montgomery County Board of Appeals denying appellants' request for a special exception for the operation of a solid waste transfer station in an I–2 Industrial Zone in the Southlawn Lane industrial corridor of Rockville, a zone in which such uses are permitted as special exceptions.

This case is a companion case to one also on appeal and being considered by the same panel of this Court, *Mossburg v. Montgomery County* [No. 57, 1995 Term], which involves the grant of declaratory and injunctive relief, foreclosing Mossburg's attempt to continue the operation of a solid waste transfer operation at another location as a legal nonconforming use. The case *sub judice* arises out of appellants' attempt to transfer the business from that location to the one in the instant case. In order to do so, a special exception is necessary.

There have been several judicial proceedings involving this matter. At least one has proceeded as far as the Court of Appeals. The companion case, at one point, at least facially, was subject to a compromise via a consent agreement before an administrative agency. That settlement contemplated the possible relocation of the operation. At that time, the Montgomery County zoning code did not permit such uses in any zone. The County apparently amended the code to provide for such uses in certain industrial zones. The legislative process began as an attempt to classify such uses as permitted in the designated zone. For whatever reason, by the time the

process was completed, solid waste transfer uses were permitted in I–2 Industrial Zones, but only as special exceptions.

The inventory of I–2 Zones in Montgomery County is apparently extremely limited.[1] The I–2 industrial corridor at issue here is already intensively built up with heavy industrial uses, as we shall hereafter discuss.

On this appeal, appellants present two questions:

I. Was the Board of Appeal[s]'s denial of the application on remand the result of impermissible "change of mind" conclusions and therefore arbitrary and capricious?

II. Were the reasons given by the Board of Appeals for its denial of the application supported by substantial evidence of record?

Before discussing the facts of this particular case, it may be helpful to discuss, once again, (1) how provisions for special exceptions are created in zoning codes, (2) the policy statements made by the creation of those provisions, (3) the inherent permissive nature of such exceptions, and (4) the proper focus to be utilized in determining whether a proposed special exception satisfies the conditions of the statute.

Any discussion of any zoning matter, be it, *inter alia,* rezoning, special exceptions/conditional uses, or variances, must always recognize that zoning is an interference (if done correctly, a permissible one) with a property owner's constitutional rights to use his own property as he sees fit. The Fifth

---

**1.** In a statement to the Board, appellants' counsel, without objection, noted:

> As this Board knows . . . we have basically four pockets of industrial zoning in the county; the Pepco site . . ., Montgomery Industrial Park on Route 29 . . ., a pocket of Industrial–2 around Brookville . . . and Southlawn Lane.
> . . . [T]hat deal [at Montgomery Industrial Park] fell through. . . .
> He couldn't buy anything from Pepco . . . that is obvious; and the ground at Brookville . . . doesn't exist as far as vacant, available ground. So his only choice was to go to Southlawn Lane.

Amendment to the United States Constitution provides, in pertinent part:

> No person shall be ... deprived of ... property, without due process of law; nor shall private property be taken for public use, without just compensation.

*See also* Article 24 of the Maryland Declaration of Rights. In *Offen v. County Council,* 96 Md.App. 526, 625 A.2d 424 (1993), *aff'd in part, rev'd in part on other grounds,* 334 Md. 499, 639 A.2d 1070 (1994), we noted that, in *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1014–15, 112 S.Ct. 2886, 2892–93, 120 L.Ed.2d 798 (1992), the Supreme Court there said that, in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), the Court "had first recognized" that

> [i]f ... the uses of private property were subject to unbridled, uncompensated qualification under the police power, "the natural tendency of human nature [would be] to extend the qualification more and more until at last private property disappear[ed]."

*Offen,* 96 Md.App. at 550–51, 625 A.2d 424. We went on, in *Offen,* to describe part of the history of zoning generally and its legitimate regulation of uses of private property, recognizing the awesome (but not unlimited) power of government to regulate such uses.

█ In that regard, we perceive no illegality, in the case *sub judice,* on the part of the legislative body of Montgomery County in establishing that solid waste transfer operations are permitted as special exceptions only in the I–2 Industrial Zones of Montgomery County. In fact, had that policy-making body chosen to prohibit such uses altogether, we would not be inclined to question its powers to do so unless, in so doing, it eliminated all viable economical uses of a property.[2] Appellants, in the case *sub judice,* do not challenge the

---

2. Of course, if all jurisdictions prohibited such uses, the debris presumably would not be permitted to leave Montgomery County and would accumulate at the locations throughout the County where it first became debris. Whether a county can legislate that the debris accumulat-

power of the County to provide for the use by way of a special exception, but question whether the body charged with administering that law, *i.e.,* the Board, has done so properly.

## Special Exceptions

We noted, in *Cromwell v. Ward,* 102 Md.App. 691, 701, 651 A.2d 424 (1995), citing *Stacy v. Montgomery County,* 239 Md. 189, 193, 210 A.2d 540 (1965), that "[a] special exception . . . is expressly permissible. . . ." *See also Montgomery County v. Merlands Club, Inc.,* 202 Md. 279, 288, 96 A.2d 261 (1953); *Cromwell,* 102 Md.App. at 702, 651 A.2d 424 (citing *Eberhart v. Indiana Waste Systems, Inc.,* 452 N.E.2d 455, 459 (Ind.App. 3 Dist.1983) ("A conditional use [3] is a desirable use which is attended with detrimental effects which require that certain conditions be met.")); *Ash v. Rush County Bd. of Zoning Appeals,* 464 N.E.2d 347, 350 (Ind.App. 1 Dist.1984) ("A special exception involves a use which is permitted . . . once certain statutory criteria have been satisfied.").

We noted, in respect to attempts to utilize variance procedures to eliminate conditions, in the conditional use case of *Chester Haven Beach Partnership v. Board of Appeals,* 103 Md.App. 324, 336, 653 A.2d 532 (1995), that it is "the generally accepted proposition[ ] that, if the express conditions . . . are met, it is a permitted use because the legislative body has made that policy decision." Thus, we conclude, as this Court and the Court of Appeals often have, that a special exception/conditional use in a zoning ordinance recognizes that the legislative body of a representative government has made a policy decision for all of the inhabitants of the particular governmental jurisdiction, and that the exception or use is

---

ing within its borders cannot remain there is another question for another day and might well raise interesting issues to be addressed by the State.

**3.** As we pointed out in *Cromwell v. Ward,* 102 Md.App. 691, 699 n. 5, 651 A.2d 424 (1995), special exceptions and conditional uses are clearly intertwined.

desirable and necessary in its zoning planning provided certain standards are met.

The modern seminal case, authored by the late Judge Davidson (who had herself risen through the community organizations and the planning/zoning arena of Montgomery County), is *Schultz v. Pritts,* 291 Md. 1, 432 A.2d 1319 (1981). That case, with but minor modifications, and with but one or two strained deviations, *see Board of County Comm'rs v. Holbrook,* 314 Md. 210, 550 A.2d 664 (1988), remains the standard by which special exception questions are resolved. After furnishing legal and historical background, Judge Davidson noted for that Court that

> [w]hen the legislative body determines that *other uses are compatible with the permitted uses* in a use district, but that the beneficial purposes such other uses serve do not outweigh their *possible* adverse effect, such uses are designated as conditional or special exception uses. Such uses cannot be developed *if at the particular location proposed* they have an adverse effect *above and beyond* that ordinarily associated with such uses.

*Schultz,* 291 Md. at 21–22, 432 A.2d 1319 (emphasis added, citations omitted).

Thus, it is not whether a special exception/conditional use is compatible with permitted uses that is relevant in the administrative proceedings. The legislative body, by designating the special exception, has deemed it to be generally compatible with the other uses. In special exception cases, therefore, general compatibility is not normally a proper issue for the agency to consider. That issue has already been addressed and legislatively resolved. Moreover, it is not whether a use permitted by way of a special exception will have adverse effects (adverse effects are implied in the first instance by making such uses conditional uses or special exceptions rather than permitted uses), it is whether the adverse effects in a particular location would be greater than the adverse effects ordinarily associated with a particular use

that is to be considered by the agency. As Judge Davidson opined in *Schultz:*

> [T]he appropriate standard to be used in determining whether a requested special exception use would have an adverse effect and, therefore, should be denied is whether there are facts and circumstances that show that the particular use proposed at the particular location proposed would have any adverse effects *above and beyond those inherently associated with such a special exception use irrespective of its location within the zone.*

*Id.* at 22–23, 432 A.2d 1319 (emphasis added). The question in the case *sub judice,* therefore, is not whether a solid waste transfer station has adverse effects. It inherently has them. The question is also not whether the solid waste transfer station at issue here will have adverse effects at this proposed location. Certainly, it will and those adverse effects are contemplated by the statute. The proper question is whether those adverse effects are above and beyond, *i.e., greater here* than they would generally be elsewhere within the areas of the County where they may be established, *i.e.,* the other few I–2 Industrial Zones. In other words, if it must be shown, as it must be, that the adverse effects at the particular site are greater or "above and beyond," then it must be asked, greater than what? Above and beyond what? Once an applicant presents sufficient evidence establishing that his proposed use meets the requirements of the statute, even including that it has attached to it some inherent adverse impact, an otherwise silent record does not establish that that impact, however severe at a given location, is greater at that location than elsewhere.

In the recent case of *Sharp v. Howard County Bd. of Appeals,* 98 Md.App. 57, 73, 632 A.2d 248 (1993), Judge Harrell, for this Court, noted the position of the appellants in that case:

> [A]ppellants postulate that *Schultz v. Pritts* can only be correctly applied if the agency . . . first identifies the universe of potential adverse effects inherently associated with the abstract special exception use (which the legislative

body was presumptively aware of when it permitted the use only after the grant of a special exception). With those inherent adverse effects in mind, the Board must then analyze which of the actual adverse effects on adjoining and surrounding properties demonstrated in the particular application exceed, in kind or degree, the inherent adverse effects due to the proposed location of the subject property of the application.

Judge Harrell then acknowledged the *Schultz* Court's discussion of the nature of the requisite adverse effect that would compel denial of a special exception. That discussion involved a contrasting review of two cases—*Deen v. Baltimore Gas & Elec. Co.*, 240 Md. 317, 214 A.2d 146 (1965), involving overhead power lines, and *Anderson v. Sawyer*, 23 Md.App. 612, 329 A.2d 716 (1974), *cert. denied*, 274 Md. 725 (1975), which, like *Schultz*, involved a funeral home. In discussing the cases, we quoted a portion of *Deen* that appears especially appropriate here:

Appellants assert that it was error for the Board to fail to consider the future effects which the high tension wires would have on the health, safety and general welfare of the locality. . . . This factor was without relevance in this case, *because there was no evidence produced at the hearing which would show that the effect of high tension wires . . . [in] this area would be in any respect different than its effect on any other rural area. Section 502.1 implies that the effect on health, safety or general welfare must be in some sense unique or else a special exception could never be granted in such an area. . . .*

*Sharp*, 98 Md.App. at 77–78, 632 A.2d 248 (bold added). We likewise emphasized in *Sharp* portions of our *Anderson* decision:

"*. . . Because there were neither facts nor valid reasons to support the conclusion that the grant of the requested special exception would adversely affect adjoining and surrounding properties in any way other than result from the location of any funeral home in any residential zone, the*

*evidence presented by the protestants was, in effect, no
evidence at all."*

*Id.* at 79, 632 A.2d 248 (bold added.)

We shall now consider the issues of this case—*i.e.,* the
evidence presented and the findings of the Board, findings
affirmed by the trial court—keeping in mind as we do what we
said about special exceptions in *People's Counsel v. Mangione,*
85 Md.App. 738, 747–48, 584 A.2d 1318 (1991):

> The term "special exception" refers to a "grant by a
> zoning administrative body pursuant to existing provisions
> of zoning law and subject to certain guides and standards of
> special use permitted under provisions of existing zoning
> law." *Cadem v. Nanna,* 243 Md. 536, 543, 221 A.2d 703
> (1966). *It is a part of a comprehensive zoning plan,
> sharing the presumption that it is in the interest of the
> general welfare* and is, therefore valid. It is a use which
> has been legislatively predetermined to be conditionally
> compatible with the uses permitted as of right in a particu-
> lar zone.... In sum, special exception is a "valid zoning
> mechanism that ... the legislative body has determined
> can, *prima facie,* properly be allowed in a specified use
> district, absent any fact or circumstance in a particular case
> which would change this presumptive finding."

85 Md.App. at 747–48, 584 A.2d 1318 (some emphasis added,
footnote and citations omitted). We also keep in mind the
standard of review we reiterated in *Mangione,* at 750, 584
A.2d 1318:

> The general standard of judicial review of most adminis-
> trative factfinding is: "whether a reasoning mind reason-
> ably could have reached the factual conclusion the agency
> reached; this need not and must not be either judicial fact-
> finding or a substitution of judicial judgment for agency
> judgment." *Holbrook,* 314 Md. at 218, 550 A.2d 664 (quot-
> ing *Supervisor of Assess. v. Ely,* 272 Md. 77, 84, 321 A.2d
> 166 (1974)). Specifically, we shall review facts and circum-
> stances upon which the Board could have found that the
> special exception use and location proposed would cause an

adverse effect upon adjoining and surrounding properties unique and different, in kind or degree, than that inherently associated with such a use regardless of its location within the zone. *Holbrook,* 314 Md. at 217–18, 550 A.2d 664. [Footnotes omitted.]

We shall first direct our attention to appellants' second issue. We shall recite the facts as necessary.

## II.

**Were the reasons given by the Board of Appeals for its denial of the application supported by substantial evidence of record?**

We address the relevant portion of the "Opinion of the Board," *i.e.,* the findings and opinion of the Board. As the special exception here at issue has, by the very reason of provisions for its existence, been predetermined by the legislative, policy-making body of Montgomery County to be generally "beneficial," *Schultz, supra,* and presumptively compatible, our discussion of the Board's opinion will be primarily directed to its findings of adverse effects.

In its findings, the Board stated that the majority of its members remain concerned, as they were in 1990,[4] about the impact of the proposed special exception on the environment and on traffic safety. The Board concludes that the application must be denied because the applicant has not met its burden on these two vital issues.

We shall thus limit this portion of our review to those issues, *i.e.,* findings the Board states are the basis for its denial of the application, *i.e.,* the "environment" and "traffic safety." We shall attempt to focus on the relationship those two findings have in respect to the standards that apply in cases involving special exceptions, especially to the requirement that such adverse effects be greater, *i.e.,* above and

---

4. Apparently, the Board misspoke. In 1990, a majority of its members voted to grant the special exception. Because of a "super-majority" requirement, since ruled invalid, it was not granted.

beyond, the adverse impact generally in other areas where such special exceptions are permitted. We therefore look for evidence, if any, in the record of the adverse effects and impact that could generally be expected as an inherent adverse impact anywhere in the I–2 Zones in order to determine whether the environmental and traffic safety impact at the subject site is greater.

The Board found that there would be adverse impact from runoff from the subject site into a tributary that ultimately drains into Rock Creek, the Potomac River, and the Chesapeake Bay. There is evidence to support that finding. There was no evidence, however, that other areas in this particular I–2 industrial corridor do not drain into the same tributary. The exhibits indicate that other properties in the corridor very possibly do. Moreover, there was no evidence as to whether the three other I–2 Zones located elsewhere in Montgomery County (Pepco, Montgomery Industrial Park, Brookville) drain into Rock Creek, the Potomac River, or the Chesapeake Bay watershed. Indeed, we know of no areas in Montgomery County where storm water runoff does not ultimately drain into the Chesapeake Bay.[5] We note again that the exhibits in the record indicate that Rock Creek, through its tributary, Southlawn Creek, drains the entire Southlawn I–2 industrial corridor, the specific I–2 Zone at issue here.

Appellants asserted below, and here, that the drainage pattern of the industrial uses of the subject site runs from the site, *i.e.,* the southeast side of Southlawn Lane, to Southlawn

---

5. An official publication of the Maryland Department of Natural Resources, "Trees for Maryland's 'Watersheds,' " provides:

> Maryland has six major watersheds. A small percentage of water in the western most part of the State [the Youghiogheny River watershed in Garrett County] flows to the Ohio River, through the Mississippi and eventually to the Gulf of Mexico. Another small percentage in the east [situated completely within Worcester County] flows directly to the Atlantic Ocean. The remaining water, ["Potomac River Watershed," "West Chesapeake Watershed," "Susquehanna River Watershed," "East Chesapeake Watershed," and the "Patuxent River Watershed"] approximately 90%, drains into the Chesapeake Bay.

Creek, and argue that runoff would, therefore, cross South-lawn Lane and find its way into that Creek. This pattern of runoff is due to the presence of a hill behind the subject site and, apparently, behind the other sites as well. It appears from the exhibits that most, if not all, of the existing uses in the I–2 Zone along the Southlawn Lane industrial corridor to the north of Gude Drive that abut on the lane drain in that direction as well.[6] If so, and it appears so, Southlawn Creek is subject to drainage from the printing plant, the Levine junk-yard, the Wilcoxon operation, Montgomery Concrete batching operation, Montgomery Scrap Corporation (apparently a metal recycling facility), F.O. Day Co. (a construction company that appears to process scrap material at this location), Brigham & Day Paving Company, Genstar Stone Products Co., and A.H. Smith Asphalt Plant. Rockville Fuel and Feed and Beltway Movers also abut on Southlawn. Just behind Beltway Movers is Genstar Asphalt (another asphalt mixing plant) and, be-tween Beltway Movers and Rockville Fuel and Feed, abutting on Southlawn, is another concrete batching plant, which uti-lizes, among other vehicles, numerous concrete and dump trucks.

Additionally, on the westerly side of Southlawn Creek, partially to the rear and across the Creek from the uses we have identified as being generally on the west side of South-lawn Lane, is a former Montgomery County landfill and incinerator operation that appears from the exhibits to be in the Southlawn/Rock Creek drainage basin. Moreover, there is a Montgomery County Sewage Treatment Plant off of Gude Drive, whose rear property line abuts on a wooded area that appears to be contiguous with Southlawn Creek and its drain-age basin.

In respect to the environmental issue, the Board concluded that it "cannot approve a use which it believes would run counter to the steps currently being taken to protect and

---

6. Attached hereto is a photocopy of a photograph admitted below, showing the relative locations of Southlawn Lane and the uses situated on that road. Mossburg's proposed location is identified as "Site."

improve Southlawn Creek. Denial is warranted for this reason alone." Interestingly, in so finding, the Board ignored the County Environmental Planning Division's (EPD) findings and recommendations, including the fact that "staff would recommend conditional approval subject to the applicant revising the currently approved ... plan and obtaining approval from MCDEP." Appellant revised the plan and agreed to meet the criteria and conditions of EPD. We shall further address this "environmental issue," *infra.*

In discussing traffic safety, the Board of Appeals initially acknowledged that a preliminary plan of subdivision will ultimately be required before actual permits for a solid waste transfer station could issue. It then acknowledged that the Planning Board was the proper body to evaluate the adequacy of the roads to handle the traffic generated by the use. It noted that § 59–G–1.21(a)(8) of the Montgomery County Code directs the Board of Appeals to condition the grant of a special exception on the Planning Board's determination of adequacy, *i.e.,* to defer to the Planning Board, and acknowledged that it is not its function to determine the adequacy of intersections or other facilities in respect to traffic. "Therefore, this Board will not make a finding about the adequacy of nearby intersections *or other elements* related to the adequacy of public facilities." (Emphasis added.) Nevertheless, it immediately did that which it has just said it would not do, by bootstrapping specific traffic safety matters under the general provisions of the Code.

The Board then paid lip service to the *Schultz* requirement of site specific adverse impact by saying:

The Board's findings about traffic safety relate to the unique location of the subject property within the I–2 Zone. The subject property faces Southlawn Lane, which is a four lane road until just west of the Mossburg site.

Only one other established use is northeast of, *i.e.,* farther out,

the Southlawn Lane industrial corridor from Gude Drive,[7] that being the printing plant. This commercial printing plant also has truck loading and off-loading facilities and, from the photos admitted in evidence, parking for scores of vehicles. Further, it is situated on the two-lane portion of the road. It appears that Montgomery Concrete, a batching, mixing, and truck loading plant, across Southlawn Lane, is just south of the subject site. It fronts Southlawn Lane at the point where the road narrows. The exhibits show numerous heavy trucks at that location. · The Levine property is situated on the southeast side of Southlawn Lane, abutting the subject site. It is, apparently, a junkyard—or at least a storage area for junked vehicles. Approximately 100 or more vehicles, including trucks and trailers, are shown situated on that location on the exhibits admitted in evidence. The Levine property is also on the two-lane section of Southlawn Lane.

Next to the Levine property, on the same side of Southlawn Lane as the subject property, is a site identified as the J.W. Wilcoxon property. It is located approximately where Southlawn Lane begins to narrow to less than four lanes. In the exhibit in evidence, in addition to buildings and cars, there were eleven or twelve trucks of various sizes on the site at the time the pictures were taken, and several vehicle trailers in addition to other equipment the purpose or use of which is · unclear. On the west side of Southlawn Lane is another J.W. Wilcoxon facility abutting on "Incinerator Lane," south of Montgomery Concrete. It contains what appears to be large garages and warehouses. In addition to numerous cars, there are many trucks of various sizes, including tractor-trailer trucks and front-end loaders, and stored timber, pilings and other lumber situated on the site. These uses are all situated at the two-lane area of Southlawn Lane and/or at, or near, the point of its transformation from four to two lanes.

---

7. See the photocopy attached hereto that shows the relative location of the existing industrial uses and the subject site in this industrial corridor.

The Board determined that this particular site is unique because it abuts on what is a two-lane road and because trucks cannot continue past the subject property because of restrictions on a bridge located further up Southlawn Lane. The Board stretches the facts to support the result it desires to achieve. The truck traffic generated by the subject site will not go past the subject site in any event. The traffic generated by the use terminates at the use. These trucks will not "proceed past" the subject site, so the fact that they *cannot* proceed past it because of a bridge is irrelevant. Except for the printing plant, the exhibits reflect no present industrial use in this I–2 Zone past the subject site. As the Board posits, the I–2 Zone contemplates the intense involvement of heavy trucks. When the legislative body provided for the subject special exception in I–2 Zones, it necessarily contemplated heavy truck traffic as normally associated with the use. As we indicate elsewhere, this legislative body knew exactly the type of business or use for which it was providing (as it had been involved in litigation over it) and devised the special exception process, at least partially, to address this specific use.[8]

The Board went on to find that the subject use generated a heavy traffic load, and that there would be many left turns *from* the subject site onto Southlawn Lane across both lanes of traffic because right turns from the subject site would be restricted because of the bridge. What the Board and appellees fail to recognize is that, even though trucks are required to exit left, though their destinations might be to the right, because the bridge forecloses that direction of travel, these vehicles are trucks that, without the bridge limitation, would be approaching the site from the direction of the bridge and making a left turn across the same opposing traffic and the same two lanes into the site. In actuality, left turns across two lanes of traffic are not increased; they would be approxi-

---

8. We are informed that there is *out there* another special exception case involving a similar use that appellees contend generated the creation of this particular special exception legislation. The record is unclear. In any event, it was created to address solid waste transfer operations.

mately the same. They are, because of the bridge, unidirectional. The traffic problem would be roughly the same. The existence of the bridge does not increase those problems.

The Board went on to note, *not find:*

In addition, if trucks cannot enter the site because too many trucks are already there, the only place for them to wait is on Southlawn Lane, effectively blocking the eastbound lane. *While the petitioner indicated that the site could accommodate all the trucks that he expects to arrive at one time, the Board appreciates the seriousness of the problem if the estimates prove to be faulty. If* trucks block the eastbound lane waiting to enter the site, other eastbound vehicles must either wait behind them, thus backing up traffic on Southlawn Lane, or they must pull out into the westbound lane to go around the truck. On a road as narrow as Southlawn Lane, this *may* pose a serious traffic hazard.

The Board heard testimony that the County plans to widen Southlawn Lane to four lanes in front of and beyond the Mossburg site. The roadway would be relocated to the north, and the existing pavement would become a service drive in front of the site. The Board believes that this would be a much better configuration to handle the high volume of heavy truck traffic expected at the site. However, in 1990 when this testimony was presented, the widening of Southlawn Lane was not included in the County's six-year Capital Improvements Program. Given several years of serious fiscal difficulty for the County, the Board is doubtful that Southlawn Lane will be widened in the near future. *In any event, if the weight limitations on the bridge continue, outgoing trucks will still be restricted to left turns only.* [Emphasis added.]

This statement by the Board is not a finding of what is, but what *may* be. It is mere speculation, and not a finding of present or future adverse impact that would be different here than elsewhere on Southlawn Lane or in the other I-2 Zone areas of Montgomery County.

**The Statute(s)**

Section 59–C–5.2 of the Code, "Land Uses," offers a general definition of I–2 "Heavy Industrial" uses:

A fundamental distinction between heavy industrial uses and light industrial uses involves the character of the industrial development. Typically, heavy industrial uses require larger sites to accommodate activities that often involve a variety of concurrent industrial processes on one site. *Heavy industrial developments generally involve larger volumes of heavy truck traffic and are located near specialized transportation links such as rail and major highways. In addition, heavy industrial uses are often noisy, dusty and dirty, as compared to other types of industrial and commercial activities. Heavy industrial uses are restricted to land classified in the I–2 Zone because the large scale nature of such uses, the traffic impacts, and environmental effects could be disruptive to lighter intensity industrial and commercial areas.* [Emphasis added.]

Included in permitted uses in I–2 Heavy Industrial Zones are bakeries, blacksmith shops, ornamental iron works, machine shops, battery plants, contracting storage yards, dry cleaning plants, small part manufacturing, food production, including packing, packaging, and canning, fuel storage, ice manufacturing and storage, sheet metal manufacturing, numerous other manufacturing operations, including paint manufacturing, mobile home manufacturing, the manufacturing of paper products, stoneworks, distillation of alcohol, breweries, coal and tar operations, asphalt and concrete mixing plants, chemical and dye works, foundries, incinerators, junk yards, off-loading, storage and transfer of sand, gravel, or rocks, rock crushing (washing and screening), sanitary landfills, steam power plants, sugar refineries, pipelines, railroad yards and tracks, building material sales (wholesale or retail), lumberyards, outdoor storage quarries, and sand, gravel, and clay pits. In addition to solid waste transfer stations, other special exceptions that are permitted include fertilizer mixing plants, cable communication systems, heliports, gas stations, shooting ranges, and stockyards.

A solid waste transfer station is defined in § 59–A–2.1. as "[a] place ... where solid waste is taken from collection vehicles and placed in other vehicles or containers for transportation to other intermediate or final disposal facilities."

The general provisions in respect to all special exceptions include:

59–G–1.21.   General conditions.

(a)  A special exception may be granted when the board, the hearing examiner, or the district council, as the case may be, finds from a preponderance of the evidence of record that the proposed use:

   (1)  Is a permissible special exception in the zone.

   (2)  Complies with the standards and requirements set forth for the use in division 59–G–2.

   (3)  Will be consistent with the general plan for the physical development of the district, including any master plan or portion thereof adopted by the commission.

   (4)  Will be in harmony with the general character of the neighborhood considering population density, design, scale and bulk of any proposed new structures, intensity and character of activity, traffic and parking conditions and number of similar uses.

   (5)  Will not be detrimental to the use, peaceful enjoyment, economic value or development of surrounding properties or the general neighborhood; and will cause no objectionable noise, vibrations, fumes, odors, dust, glare or physical activity.

   (6)  Will not, when evaluated in conjunction with existing and approved special exceptions in the neighboring one-family residential area, increase the number, intensity or scope of special exception uses sufficiently to affect the area adversely or alter its predominantly residential nature.  Special exception uses in accord with the recommendations of a master or sector plan are deemed not to alter the nature of an area.

(7) Will not adversely affect the health, safety, security, morals or general welfare of residents, visitors or workers in the area.

(8) Will be served by adequate public services and facilities including schools, police and fire protection, water, sanitary sewer, public roads, storm drainage and other public facilities. If the special exception use requires approval of a preliminary plan of subdivision in accordance with chapter 50 of this Code, title "Subdivision of Land," the adequacy of public facilities will be determined by the planning board at the time of subdivision approval. In that case, the board of appeals must include such planning board approval as a condition of the grant of the special exception.

By reason of the holdings in *Schultz, supra,* and its progeny, such general conditions as are applied to special exceptions are themselves subject to the limitation that the adverse effects must be greater than or above and beyond the effects normally inherent with such a use anywhere within the relevant zones in the regional district (Montgomery County in this case). In the absence of a provision in the zoning statute clearly requiring a stricter standard than *Schultz, Schultz v. Pritts* applies. As we indicate elsewhere, some adverse impact is contemplated or the use would be permitted generally without resort to the special exception process. As so limited, the general provisions would have added to them, by operation of the language of the case law, *i.e., Schultz,* limiting language similar to that that we emphasize below as we reiterate certain of the relevant general conditions:

59–G–1.21.   General conditions.

. . . .

(5) Will not be [*more*] detrimental to the use, peaceful enjoyment, economic value or development of surrounding properties or the general neighborhood [*at the subject site than it would be generally elsewhere in the zone or applicable other zones*]; and will cause no [*more*] objectionable noise, vibrations, fumes, odors,

> dust, glare or physical activity [*at the subject site than it would generally elsewhere in the zone or applicable other zones*].
>
> . . . .
>
> (7) Will not adversely affect the health, safety, security, morals or general welfare of residents, visitors or workers in the area [*more at the subject site than it would generally elsewhere in the zone or applicable other zones*].

See also the more recent Court of Appeals special exception case of *Harford County v. Earl E. Preston Jr. Inc.*, 322 Md. 493, 588 A.2d 772 (1991), wherein, after restating that portion of *Schultz* in respect to adverse impacts "above and beyond" inherent impacts of special exceptions, that Court rejected our contention that a *Gowl v. Atlantic Richfield Co.*, 27 Md.App. 410, 341 A.2d 832 (1975), standard had been engrafted in Harford County's statute. The Court of Appeals, in *Preston*, reiterated the continued viability of the *Schultz* standard in special exception cases; Judge Karwacki, for the Court, opined, at 503, 588 A.2d 772, "[W]e find no intention . . . to substitute a *Gowl* test for the test . . . for measuring . . . adverse impact . . . which we adopted in *Schultz*." It is with the caveats, found in the clauses we have added and emphasized above, in mind that we review the actions of the Board, as affirmed by the trial court.

Utilizing the standard of review discussed, *supra*, in assessing the Board's determination of applicant's compliance with the "General Conditions" of the statute, *but including* the emphasized limitations that we feel must be considered when a special exception—deemed to be part of comprehensive zoning—is considered, we perceive that the application for a special exception has been wrongly denied. We explain.

First, the Board utilized only two findings in its denial—traffic safety and environmental concerns, *i.e.*, wastewater/stormwater management. We address the wastewater management issue first. The legislative body of Montgomery County has expressly provided for the environmental effects

of private solid waste transfer stations, in the County's comprehensive Solid Waste Management Plan. Moreover, the County expressly included the area of this subject property in the Southlawn Lane industrial corridor in that plan in order that the State would "process Travilah Recovery's application for a solid waste permit at the new site. The County supports this amendment to facilitate moving the operation to the new site." The County went on to emphasize that solid waste management was primarily to be part of the waste management plan, noting in the amendment to its waste management plan:

II.I.3.c(2), Transfer Stations, private.

Private persons who wish to operate solid waste transfer stations or recycling facilities in Montgomery County may not do so without a State solid waste disposal permit. The State will not issue a permit unless the site is shown in the Comprehensive Solid Waste Management Plan. With respect to these sites:

1. The County will review and comment on State solid waste disposal permit applications.

2. The site and any facility on the site must comply with all existing and future County laws and with relevant parts of this ten year solid waste management plan.

3. The County, as part of its review of permit applications, will designate materials which may be handled by private transfer stations and recycling facilities. These designations will be made at the time of application according to public solid waste flow control needs and may change from application to application.

This statute clearly indicates that the actual governmental monitoring of environmental concerns relating to a private solid waste transfer operation would be part of the County's waste management program, as opposed to its zoning programs. It reads: "The County, *as part of its review of permit applications, will designate....*" [Emphasis added.] The permit application therein mentioned thus provides for the

County's review of the State permitting process in respect to any particular permit application.

In the case *sub judice*, it was uncontradicted that handling of the materials to be transferred would be conducted inside a building serviced by interior drains that would funnel any drainage into the sanitary (not storm) sewer system. Thus, runoff from the interior operations, *i.e.*, that matter considered most polluting, would not drain ordinarily into Southlawn Creek. The sanitary system met the approval of the appropriate County agencies. Thus, as designed, it is rain water, *i.e.*, storm water, drainage that *might* periodically affect the Creek basin.

The Montgomery County Department of Environmental Protection designed and then approved a stormwater management plan for use at the subject site that included streambank protection by appellants off the subject site. Additionally, the Department required the construction of a sediment outlet trap on site and utilization of an oil/grit separator on site. All of these were agreed upon and the Department gave its approval, on July 11, 1989, that, insofar as the County was concerned, the wastewater and storm water control measures were sufficient. Subsequent agreements and covenants concerning maintenance of the required systems and bonding were duly formalized by execution and recordation of documents among the land records. As we have indicated, the Planning staff of the County recommended approval of the special exception, subject to appellants meeting certain conditions. The evidence clearly indicates that appellants have met and/or have agreed to meet those conditions.

Thus, the evidence is clear and uncontradicted that those agencies in Montgomery County charged with determining whether there would be an unacceptable adverse environmental impact from the use on the subject site have determined that there would not be.

But even more important, as we indicated earlier, there is absolutely no evidence, in respect to environmental concerns, that the environmental impact of appellants' use at the subject

site would be greater, or above and beyond, that impact elsewhere within the I–2 Zone in this industrial corridor or other I–2 Zones in that part of the regional district situated in Montgomery County. In fact, all of the evidence indicates that the impact would be the same anywhere within this I–2 industrial corridor; from the evidence, the entire area appears to be in the Southlawn Creek watershed. Additionally, there is no evidence that the impact would be different in other I–2 Industrial Zone areas in the County. Virtually every human activity has the potential for adverse impact. Zoning recognizes this fact and, when concerned with special exceptions and conditional uses, accepts some level of such impact in light of the beneficial purposes the legislative body has determined to be inherent in the use. It regulates the level of adverse impact by prohibiting only that level that is not inherent in the use. It does that primarily, as we have said, by restricting only those uses, the impact of which is greater at a particular location than it would generally be elsewhere. Appellants, by obtaining and producing at the hearing the extensive documentation in regards to the sanitary and storm water management plans, and evidence of the approval of those plans by the appropriate agencies, satisfied the burden of establishing that the use at this site was, in regards to the environmental matters, in compliance with the special exception provisions, as limited by the case law we have described, *i.e.,* that there would be no additional adverse environmental impact because of the specific location of this use at the subject site.

The protestants merely reiterated and attempted to argue that the impact from the use was greater than that stated by the Department of Environmental Planning. Even if that were so, and we are not persuaded that it is, there was insufficient evidence (virtually none) from which a reasoning mind could have determined that the impact at this site on Southlawn Lane was unique or different than the impact would be elsewhere in this I–2 Industrial Zone (north of the intersection of Southlawn Lane and Gude Drive) or, for that matter, any different than in any other I–2 Zone in the

County. Accordingly, this finding of the Board was not based upon substantial evidence. It was a finding arbitrarily made.

## Traffic

The Montgomery County Master Plan describes this Southlawn Lane I–2 industrial area as developed with heavy industrial uses, and as undesirable for residential use. As we have previously noted, the traffic patterns that might be caused by the bridge restriction would not cause any extra impact on through traffic flowing on Southlawn Avenue, in that ingress and egress lane crossing would be the same, in total, had there been no restriction on the use of the bridge.

We agree with the Board's legal conclusion that the impact of traffic flows, and the pattern caused thereby are, in Montgomery County, primarily delegated to the Montgomery County Planning Board. Moreover, as we have indicated, regardless of where in this I–2 industrial corridor this use was to be conducted, the traffic impact, including both the crossing of lanes and the potential for backups, if any, would be the same. There is no evidence to the contrary.

It is equally clear that traffic backups, if they were to exist (and the Board's discussion of the issue is little more than speculation in the face of appellants' substantial evidence that most traffic would be contained on site) would occur as trucks arrived, *i.e.*, on the easterly and southeastern side of Southlawn Lane. If such a backup of entering traffic did occur, and was as extensive as appellees contend, it would only extend a short distance on the two-lane portion of Southlawn Lane. If it were extensive, it would extend to the *four-lane* section of that road. The subject site is at the end of that four-lane section and at the end of the built-up area. Thus, most, if not all, of the traffic of other heavy trucks generated within this I–2 Zone would not pass by the subject site because that traffic must exit and enter via Gude Drive by virtue of the bridge limitations. Additionally, on the east side, large tracts of property are not being used at all and thus do not, at present, generate substantial traffic.

The Master Plan and the I–2 Zone contemplate heavy truck traffic in I–2 Heavy Industrial Zones. The proposed use will not generate anything more. The fact that residents of residential areas outside the zone perceive that additional industrial activity in this industrial zone will generate heavier truck traffic, making their attempts to utilize this industrial corridor more difficult, does not make the traffic stemming from appellants' use—a use that is presumed to be in conformance with comprehensive zoning—unique, greater, or above and beyond that which would occur anywhere else in the zone. The generic traffic concerns of appellees do not constitute substantial evidence upon which the Board could have based its decisions.

When Montgomery County created I–2 Heavy Industrial Zones, it made a policy statement that heavy industrial uses, and the traffic generated thereby, were necessary. When the County provided, by way of special exception, that solid waste transfer stations could be conducted there, it made an additional policy statement, as relevant to the Board's findings in the present case, that such uses were appropriate, beneficial, and generally compatible, so long as, at any particular location, the traffic safety and environmental impact would be no greater than, *i.e.*, would not be above and beyond, the adverse impacts inherent in such uses if conducted at an alternate site. Moreover, when Montgomery County created the provisions for special exceptions for solid waste transfer stations, it knew what that use entailed because the special exception, and the inclusion of this site in the solid waste management plan, resulted, at least in part, from appellants' operation at another site, the County's desire to stop the operation there, and the County's cooperation in seeking to have it moved elsewhere, *i.e.*, to the subject site. Not only were the general impacts of solid waste transfer stations contemplated, but the specific impacts of *this particular operation* were also contemplated.

Moreover, the planning staff reported to the Board that the adequacy of public facilities will be determined by the Planning Board at time of subdivision. . . .

. . . .

The staff . . . finds the location of a transfer station at this location acceptable. This area of Southlawn Lane is characterized by large, heavy trucks carrying cement, concrete products, building materials, fuel and similar bulky products. . . .

. . . .

Community Plans North Division of the technical staff recommended approval . . . concluding the use was compatible with the other uses. . . .

The Transportation Planning Division . . . recommended approval. . . .

. . . .

The Environmental Planning Division recommended approval. . . .

. . . .

The Development Review Division . . . finds that the use limited to 400 tons is consistent with the Montgomery County Comprehensive Solid Waste Management Plan. . . .

. . . .

The staff agrees with the findings and recommendations of the technical staff and further finds that the use conforms with the development standards of the I–2 Zone. . . . [T]he staff finds . . . :

. . . .

3. . . . [T]hat the location of a solid waste transfer station at this location is consistent with the other uses allowed in the I–2 Zone and is consistent with the Upper Rock Creek Master Plan.

4. The proposed use . . . will be in harmony with the general character of neighborhood considering the character of activity. The use . . . will have *less impact* . . . than existing uses. . . .

5. The staff further finds that the transfer station . . . will *not* be detrimental to the use, enjoyment, economic

value or development of surrounding properties or general neighborhood....

    . . . .

    8. The use will be served by adequate facilities....
    [Emphasis added.]

The staff then recommended approval subject to certain conditions.

The protestants appear to protest the increasing development of this area of I–2 Industrial Zoning. The purpose of creating such zones is to restrict and concentrate heavy industrial activity to certain designated portions of the County. The concepts embodied in such zoning contemplate that these particular areas will become more industrialized in order that other zones will not be subject to those types of uses—uses the legislative body has determined are necessary. As long as the County experiences population growth, there must be a development of wholesale and retail businesses to service the up-front needs of the growing population. There will also be a continuous need for the management and disposal of end result problems, *i.e.,* the waste products of human society. Something has to be done with it. Even a cursory examination of the exhibits admitted in the case *sub judice* causes a succinct observation—if not here, where? The answer cannot be "nowhere," as the legislative body has inferentially determined that the operation is needed and should be conducted somewhere.

To the extent appellees, Twin Lakes Citizens Association and Manor Lake Civic Association, are displeased with the County's decision to permit such uses as special exceptions in industrial zones in the first instance, an alternate, and perhaps better, recourse would be to petition the legislative body for amendments to the County zoning code prohibiting such uses generally, rather than attacking the applications for special exceptions on a piecemeal, "not in my backyard," basis. Zoning *policy* is generally better, and more appropriately addressed, in legislative forums, rather than quasi-judicial or judicial forums. Normally, *general* objections to legislative

initiatives are better addressed legislatively. As we noted earlier, however, efforts to prohibit the handling within Montgomery County of the waste therein generated might not sit well with those neighbors of the County that might end up with Montgomery County's problems.

■ The Board's decision to deny the special exception was not based on substantial or sufficient evidence of adverse impacts at the subject site greater than or above and beyond the impacts elsewhere in this particular I-2 Zone, or in any other I-2 Zones. It was, therefore, arbitrary and illegal.

We shall reverse the decision of the circuit court affirming the denial of the Board of the application for special exception and shall direct that court to order the Board to grant the special exception. In so doing, the Board may consider the imposition of those reasonable conditions that the record reflects have already been recommended by staff and agreed upon by appellants.

In light of our decision, we find it unnecessary to address appellants' "change of mind" argument, except to note that the collective mind of the Board did not change. We would question, however, whether the change of mind doctrine would apply in the first instance when the decision of the entity making the decision remains the same, even if one or more of the component parts, *i.e.,* members of the entity, may have changed their individual minds.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR THAT COURT TO REVERSE THE DECISION OF THE BOARD AND TO ORDER THAT THE BOARD GRANT THE SPECIAL EXCEPTION; COSTS TO BE PAID BY APPELLEES.**