9 A.3d 824

**MONTGOMERY COUNTY, Maryland, et al.**

v.

**Melody BUTLER d/b/a Butler Landscape Design.**

**No. 27, Sept. Term, 2010.**

Court of Appeals of Maryland.

Dec. 16, 2010.

274

Karen L. Federman Henry, Division Chief (Marc P. Hansen, Acting County Attorney and Barbara L. Jay, Associate County Attorney, Rockville; Jeffrey W. Harab of Law Offices of Jeffrey W. Harab, P.C., Chevy Chase), on brief, for appellants.

Susan W. Carter (Miller, Miller & Canby, Chtd., Rockville), on brief, for appellee.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

HARRELL, J.

This case invites us to revisit our modern cases exploring the essence of "special exceptions"[1] and their role in the regulatory scheme of zoning—principally starting with *Schultz v. Pritts*, 291 Md. 1, 432 A.2d 1319 (1981), and running to, most recently, *People's Counsel for Baltimore County v. Loyola College in Maryland*, 406 Md. 54, 956 A.2d 166 (2008). We shall revisit these cases, not to reaffirm, reverse, or modify their holdings, but rather to consider the extent to which a local legislative body, in enacting amendments to its zoning ordinance, may craft those amendments so as to establish a

---

**1.** The terms "special exception," "conditional use," and "special use permit" are understood in modern Maryland land use law to be interchangeable. *See People's Counsel for Baltimore County v. Loyola College in Md.*, 406 Md. 54, 72 n. 19, 956 A.2d 166, 176 n. 19 (2008); *Hofmeister v. The Frank Realty Co.*, 35 Md.App. 691, 699, 373 A.2d 273, 277 (1977).

different analytical template for special exception applications than was considered and discussed in those cases.[2]

Montgomery County, Maryland ("the County")[3] and Cora Weeks ("Weeks") (a neighbor of the subject property that is the subject of the pertinent special exception application) (collectively "Appellants") appeal from the judgment of the Circuit Court for Montgomery County, which reversed the Montgomery County Board of Appeals's ("the Board") denial of Melody Butler's, d/b/a Butler Landscape Design ("Butler" or "Appellee"), application for a special exception, the grant of which was necessary for Butler to validate the otherwise illegal operation of a landscape contractor's business that she established on her property without benefit of a special exception. In arguing that the Circuit Court's reversal of the Board's denial of the application was erroneous, Appellants posit that substantial evidence exists in the record to support the Board's denial, pursuant to the criteria of the relevant and prevailing zoning ordinance provisions. More specifically, Appellants argue that, considering the definition of "non-inherent adverse effects" stated in § 59–G–1.2.1 of the Montgomery County Code ("the County Code")[4]—"physical and operational

---

**2.** The prescient legislative body in the present case prophecied in 1999 that a case requiring this analysis would reach the Court eventually. In an "opinion" accompanying the Zoning Text Amendment enacting the provisions relevant to this case, the County Council of Montgomery County (sitting as the District Council for those portions of the County located within the Maryland–Washington Regional District, *i.e.*, acting as the principal zoning authority under the relevant state enabling legislation) raised the "fundamental question" of "whether the Council has legislative authority to change caselaw on special exceptions, and if so, as a policy matter, how should the law governing special exceptions be changed?" Ordinance 14–11; Zoning Text Amendment 99004 (16 November 1999).

**3.** The County intervened successfully as a respondent in the Circuit Court's judicial review action, initiated by Butler, challenging the County Board of Appeals's denial of her special exception application. The County thereafter shouldered the main burden for its subsumed entities, the District Council and the Board of Appeals, in this action.

**4.** Unless stated to the contrary elsewhere in this opinion, all statutory citations are to the provisions of the prevailing zoning ordinance portion of the County Code.

characteristics not necessarily associated with a particular use, or adverse effects created by unusual characteristics of the site"—the Board concluded correctly that the configuration of Butler's property and the layout of the operation of the landscaping business on the property would create unacceptable non-inherent adverse effects (essentially noise from trucks) on neighboring properties sufficient to deny the application. In response, Butler argues that, the County Code provisions notwithstanding, the proper analysis of the evidence should be confined to what the *Schultz* line of cases states about the respective roles of inherent versus non-inherent adverse effects of the proposed use and how each relates to consideration of special exception applications. In effect, Butler argues that § 59–G–1.2.1 of the County Code "must be read in context and harmony with the holding in *Schultz* ... and its progeny from which it was derived," resulting in an affirmance of the Circuit Court's judgment. Truck noise, she claims, is an inherent adverse effect from a landscape contractor's business whenever proposed and, therefore, such noise does not undercut the presumption of compatibility enjoyed by a proposed special exception use by virtue of its inclusion in the comprehensive zoning plan, *i.e.*, the zoning ordinance.

We hold, as explained *infra*, that, to the extent there is any inconsistency between the special exception standards in the prevailing County Code and the reasoning and holdings of *Schultz* and its progeny, the County ("District Council") was free to legislate as it did here; that is, we disagree with the notion that a local zoning ordinance's treatment of special exceptions always must "be read in context and harmony with the holding in *Schultz*," and we refuse to give such ordinances this "judicial gloss" when the local legislature has spoken unambiguously to the contrary. Accordingly, we shall reverse the judgment of the Circuit Court for Montgomery County and remand to that court with instructions to affirm the decision of the Board denying Butler's special exception application, which was supported by substantial evidence.

## FACTS AND PROCEEDINGS

Melody Butler operates a landscape contracting business, under the name Butler Landscape Design, at 21020 Peach Tree Road, in Dickerson, Montgomery County, Maryland. The real property on which the business operates, which Butler owns, is a 2.68–acre lot improved with a single-family residence. The lot is in an area zoned in the "Rural Density Transfer" zone.[5] Pursuant to the County Code, landscape contracting is not permitted as of right in the RDT zone, but may be allowed with the grant of a special exception. *See* Montgomery County Code, § 59–C–9.3(c) (2009). Butler established her business without obtaining the requisite special exception first. On 27 April 2006, the County's Department of Permitting Services issued Butler a Notice of Violation.[6]

---

5. According to the County Code,

> [t]he intent of this zone is to promote agriculture as the primary land use in sections of the County designated for agricultural preservation in the General Plan and the Functional Master Plan for Preservation of Agriculture and Rural Open Space. This is to be accomplished by providing large areas of generally contiguous properties suitable for agricultural and related uses and permitting the transfer of development rights from properties in this zone to properties in designated receiving areas.
>
> Agriculture is the preferred use in the Rural Density Transfer zone. All agricultural operations are permitted at any time, including the operation of farm machinery. No agricultural use can be subject to restriction on the grounds that it interferes with other uses permitted in the zone, but uses that are not exclusively agricultural in nature are subject to the regulations prescribed in this division 59–C–9 and in division 59–G–2, "Special Exceptions–Standards and Requirements."

Montgomery County Code, § 59–C–9.23 (2009).

6. The County hearing examiner later found, in rendering his findings and conclusions on Butler's special exception application,

> Butler has displayed a pattern of ignoring governing restrictions: starting the Peach Tree Road business without inquiring whether a special exception was necessary despite having just been cited in another location for operating without a permit; trying to mislead [Cora] Weeks [(a neighbor)] about having Board approval for the Peach Tree site; using the 50–foot buffer for her operations after she filed her petition [for a special exception], despite having been made aware the buffer cannot be used; ignoring her sworn pledge that employees will leave the premises by 7 p.m.; failing to register three

Thereafter, on 30 July 2007, Butler, in an effort to correct the violation and validate her business, filed an application for a special exception to operate a landscape contractor's business.

The subject property is rectangular in shape, measuring 170 feet along its sole street frontage, Peach Tree Road, as well as the rear of the lot; 682 feet along its northern side; and, 695 feet on the southern side.[7] The abutting lots on either side of Butler's property (the northern of which is owned by Cora Weeks), also having Peach Tree Road as their sole street access, are approximately of similar size and shape to Butler's lot, and each lot contains an occupied residence. Peach Tree Road borders the three properties to the east (along the front of the properties), and a farm borders all three lots to the west (to the rear of the properties). The neighborhood is predominantly rural in development character, and all of the lots are zoned as RDT.

A gravel driveway on Butler's property extends from Peach Tree Road, forms a loop in front of the residence, and then runs along the northern side of the lot, forming a second loop behind the house, where Butler stores and loads contracting equipment and supplies. The edge of the driveway is approximately twenty-two feet from the northern property line, and lies about forty-two feet from Weeks's residence. Separating Butler's lot from Weeks's lot is a row of white pine trees, although many of the trees lost their lower branches by the time of the special exception hearing before the County hearing examiner.

---

of her commercial vehicles in Maryland. These are neither inadvertent nor minor lapses.

The hearing examiner concluded further that "[i]t became evident during the hearing that Butler tends to do what she wants without regard to legal and other obligations, including those of which she was well aware."

7. The facts regarding Butler's use (and proposed use) of her property and the relationship of the property to surrounding properties are excerpted from the hearing examiner's findings of fact, relied upon by the Board, and other record evidence.

Butler's business provides landscape services, including: mulching, planting, weeding, mowing, and tree and snow removal for both residential and commercial properties, most of which are in Montgomery County. While all of these services are conducted off-site, equipment and materials necessary to carry out these services are stored on the subject property. Stored materials, all located on the rear of the subject property, include: nursery stock, trees, plants, mulch, firewood, flagstones, and landscaping equipment. The company operates year round, with the busiest periods from March through May and October through December. During these busy seasons, the company employs seven people, working six days a week and arriving on those days at approximately 7 a.m. When employees arrive for work, they load the trucks with the stock and equipment stored on-site and then drive to the location of the work to be performed, after which departure there is little activity on-site until the end of the day. The employees return the trucks to the lot by approximately 6:00–6:30 p.m. The employees are supposed to depart the site within a half hour, but Butler admitted that this schedule is not followed uniformly. No customers visit the property, and all office-bound work is done off-site.

In her special exception application, Butler proposed to limit mulch deliveries to the site to no more than three times per week during the period of March–June, and no more than two times per week for the remainder of the year. Additionally, Butler anticipated that plant stock would be delivered no more than two times per season. An on-site dumpster will be emptied once per week during the busy season and less frequently during slower periods.

Butler's truck fleet consists of five trucks and two off-road utility vehicles (Bobcats). All of the vehicles are kept on the subject property and are picked up and returned each day. In her special exception application, Butler stated that she plans to erect a prefabricated shed behind the residence in which to store the vehicles, tools, and other equipment. Butler hoped to pave the existing gravel driveway in its present location. She also planned to install additional screening for

noise-reduction purposes, including a six-foot tall, wood-on-wood fence along the northern property line (the shared line with Weeks's lot), and white pine trees along the southern property line.[8]

Neighbors, through letters to and testimony before the Board and examiner, complained about the noise created by the trucks associated with Butler's activities, including that of hydraulic lifts and the safety alert sounds when they were driven in reverse gear. One neighbor complained of an "offensive odor" perceived on the neighbor's adjacent property emanating from trash and delivery trucks on Butler's property. Finally, neighbors opined that the use of the Butler property for contracting purposes had "severely diminished" the value of their homes.

The local planning agency came to conflicting recommendations on what action should be taken on Butler's special exception application. The Montgomery County Planning Board of the Maryland–National Capital Park and Planning Commission ("MNCPPC") unanimously recommended that the application be denied. On the other hand, contrary to the recommendation from its Community–Based Planning Division, the report compiled by the Technical Staff of the MNCPPC recommended approval, with conditions.

Following an 8 February 2008 public hearing, the County zoning hearing examiner, on 24 June 2008, issued a 60–page findings of fact, conclusions of law, and recommendation in which he recommended that the application "requesting a special exception to conduct business as a landscape contractor in an RDT zone at 21020 Peach Tree Road be DENIED." The hearing examiner reasoned ultimately that

---

8. According to our review of the record extract, there was no scientific evidence of ambient noise levels in the neighborhood or associated with Butler's existing use of the subject property, or of the noise attenuation properties of her proposed additional screening. By observing the absence of this information, we do not mean to suggest a "CSI–effect" implication.

the use contemplated will have serious adverse consequences on Weeks's property because of the commercial traffic engendered along Butler's driveway 42 feet from Weeks's residence and a mere 22 feet from her property line. The noise generated by trucks and Bobcats backing up to load and unload on Butler's property will also seriously disturb both adjacent neighbors. Because of the narrowness of Butler's lot, the configuration of the commercial use that Butler has included in her site plan, and the closeness of the commercial use to neighboring properties, I do not believe that conditions can be devised that will attenuate these adverse effects adequately.

By a vote of 3–1, the Board of Appeals "concur[red] with the Hearing Examiner's finding that the special exception as proposed and in this particular location presents non-inherent adverse effects sufficient to warrant denial of this special exception." Specifically, the Board highlighted the hearing examiner's findings that: (1) due to the proximity to Weeks's property, the commercial traffic traveling on the driveway would have serious adverse consequences on that property; (2) the noise generated by the trucks and the Bobcats, when operated in reverse, would have serious adverse consequences on both adjoining neighbors; and (3) the configuration of the lots and of the proposed use would produce traffic and noise on the property having immediate adverse effects on the adjoining neighbors.

Butler sought judicial review of the Board's decision by the Circuit Court for Montgomery County. The County and Weeks intervened successfully. The Circuit Court reversed the Board's decision, holding that "[t]he Board erred as a matter of law in concluding that the inherent effects of a landscaping company operation on the Property rise to the level of non-inherent effects." The Circuit Court reasoned that all of the proffered adverse effects "remain inherent to the operation of the landscaping business...." In rejecting the Board's determination that the proximity of Butler's driveway to Weeks's lot was a sufficient non-inherent adverse effect upon which to deny the application, the Circuit Court noted

that "[v]irtually all of the inherent adverse effects ... will take place at the rear of the Property, over three hundred feet from the neighboring property and home," and concluded that the Board "erroneously concluded that the inherent adverse effects in this unique factual circumstance [rise] to the level of non-inherent and erred as a matter of law in denying Petitioner's application for Special Exception."

The County and Weeks appealed timely to the Court of Special Appeals. On our initiative, we issued a writ of certiorari, *Montgomery County v. Butler*, 414 Md. 330, 995 A.2d 296 (2010), before the intermediate appellate court decided the appeal. We consider here Appellants' question of whether the "trial court err[ed] in its determination that [the] Board of Appeals had erred in its determination that inherent adverse effects of a landscaping business would become non-inherent adverse effects due to shape and configuration of the subject property."

## DISCUSSION

### I. Standard of Review

Judicial review of the final zoning action of a local administrative body, such as the denial of Butler's special exception application by the Board of Appeals, "is narrow; it is limited [usually] to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determin[ing] if the administrative decision is premised upon an erroneous conclusion of law." *Marzullo v. Kahl*, 366 Md. 158, 171, 783 A.2d 169, 177 (2001) (quoting *Bd. of Physician Quality Assurance v. Banks*, 354 Md. 59, 67–68, 729 A.2d 376, 380 (1999)) (quotation marks and citations omitted). When reviewing a final decision of the Board, we look "through the circuit court's ... decision[ ], although applying the same standards of review, and evaluate[ ] the decision of the agency." *Loyola College*, 406 Md. at 66, 956 A.2d at 173 (quoting *People's Counsel for Baltimore County v. Surina*, 400 Md. 662, 681, 929 A.2d 899, 910 (2007)).

Further, "[i]n judicial review of zoning matters, including special exceptions . . . 'the correct test to be applied is whether the issue before the administrative body is "fairly debatable," that is, whether its determination is based upon evidence from which reasonable persons could come to different conclusions.' " *White v. North,* 356 Md. 31, 44, 736 A.2d 1072, 1079–80 (1999) (quoting *Sembly v. County Bd. of Appeals of Baltimore County,* 269 Md. 177, 182, 304 A.2d 814, 818 (1973)). Thus, in examining the record made below, "we do not engage in an 'independent analysis of the evidence,' " *Armstrong v. Mayor of Baltimore,* 410 Md. 426, 444, 979 A.2d 98, 109 (2009) (quoting *Bereano v. State Ethics Comm'n,* 403 Md. 716, 731, 944 A.2d 538, 547 (2008)), and we proceed from the premise that an agency's decision is prima facie correct and presumed valid, *Marzullo,* 366 Md. at 172, 783 A.2d at 177 (quoting *Banks,* 354 Md. at 68, 729 A.2d at 381), if reached in accordance with the applicable and valid regulatory scheme.

The issue before us involves ultimately our review of the Board's determination that non-inherent adverse effects persisted on Butler's property from her on-going use (which would not change meaningfully as proposed in her special exception application) sufficient to deny the application. As discussed more fully *infra,* the County Code defines "inherent adverse effects" and "non-inherent adverse effects." *See* Montgomery County Code § 59–G–1.2.1 (2009). Neither party contests the meaning of these terms nor do they ask this Court to construe these terms. Thus, we are faced with a "mixed question of law and fact." *See generally* Arnold Rochvarg, *Maryland Administrative Law* § 4.47 at 154–57 (2d ed.2007). A court is faced with a mixed question of law and fact "when a party challenges *how* an agency applied, as opposed to interpreted, a statute. . . ." *Bayly Crossing, LLC v. Consumer Protec. Div. Office of the Attorney Gen.,* 417 Md. 128, 138, 9 A.3d 4 (2010); *see Ramsay, Scarlett & Co., Inc. v. Comptroller,* 302 Md. 825, 837, 490 A.2d 1296, 1302 (1985) ("The difference between the [parties'] position[s] . . . [are] based essentially on differing views—not as to the law governing the case—but rather as to its proper application to the

established evidence of record...."). Accordingly, in answering the question of whether (as the Board found) there were non-inherent adverse effects associated with Butler's landscape contracting business, we do so by applying the "substantial evidence" test. *See* Rochvarg, § 4.47 at 154 ("The standard of review of mixed questions of law and fact is well accepted as substantial evidence review."). In applying the substantial evidence test, we do not substitute our judgment for that of the fact finder (in this case, the Board), even if we, exercising independent judgment, may have reached a different result on the same record. *See Young v. Anne Arundel County,* 146 Md.App. 526, 567, 807 A.2d 651, 675–76 (2002).

## II. Local Regulatory Standards Governing Consideration of Special Exception Applications in Montgomery County Generally and Landscape Contractors in the RDT Zone Specifically

 Montgomery County is a "charter county." *See* MD. CONST. art. XI–A; *Montgomery County v. Anchor Inn Seafood Rest.,* 374 Md. 327, 331, 822 A.2d 429, 431 (2003) ("Article XI–A of the Maryland Constitution authorizes counties to adopt home rule charters which, as we have often pointed out, function as 'constitutions' for the counties adopting them."). Although the Express Powers Act, Maryland Code (1957, 2005 Repl.Vol.), Article 25A, § 5, enumerates express powers granted to and conferred upon any county or counties which form a charter under Article XI–A of the Maryland Constitution, "Montgomery County's zoning power ... derives exclusively from the Regional District Act [Art. 28, §§ 8–101 *et seq.*]." *Pan Am. Health Org. v. Montgomery County,* 338 Md. 214, 217, 657 A.2d 1163, 1165 (1995). The Regional District Act applies solely to those parts of the Regional District situated in Montgomery and Prince George's Counties.[9]

Section 8–101(b)(2) of the Md.Code, Art. 28 (the "Regional District Act"), provides in pertinent part:

---

9. Butler's property is in the Regional District.

TITLE 8.

DISTRICT COUNCILS FOR REGIONAL DISTRICT.

## § 8–101. Powers Generally.

\* \* \*

(b) Grant of zoning power.

\* \* \*

(2) . . . each district council, respectively, in accordance with the conditions and procedures specified in this article, may by ordinance adopt and amend the text of the zoning ordinance and may by resolution or ordinance adopt and amend the map or maps accompanying the zoning ordinance text to regulate, in the portion of the regional district lying within its county, (i) the location, height, bulk, and size of buildings, other structures, and units therein, building lines, minimum frontages, depths and areas of lots, and percentages of lots which may be occupied; (ii) the size of lots, yards, courts, and other open states; (iii) the erection of temporary stands and structures; (iv) the density and distribution of population; (v) the location and uses of buildings and structures and units therein for trade, industry, residence, recreation, agriculture, public activities, and other purposes; and (vi) the uses of land, including surface, subsurface, and air rights therein, for building, trade, industry, residence, recreation, agriculture, forestry, or other purposes.

Section 8–102 of Art. 28, entitled "Districts and [Z]ones" provides further:

For the purposes of such exercise of power, each district council may divide the portion of the regional district lying within its county into districts and zones of whatever number, shape or area it may determine. Within the districts and zones the district council may regulate the erection, construction, reconstruction, alteration, and uses of buildings and structures and the uses of the land, including surface, subsurface, and air rights therein. Both districts

and zones may be created; all regulations shall be uniform for each class or kind of building throughout any district or zone, but the regulations in one district or zone may differ from those in another district or zone.

Section 8–104 of Art. 28 authorizes generally the District Councils in Montgomery and Prince George's Counties to amend their zoning regulations "from time to time." Specifically addressing special exceptions, § 8–110(a) authorizes a district council, in its zoning regulations, to "provide that the board of zoning appeals ... in appropriate cases *and subject to appropriate principles, standards, rules, conditions, and safeguards set forth in the regulations,* may either grant or deny, upon conditions ... special exceptions ... in harmony with the[ ] general purposes and intent [of the zoning regulations]." (Emphasis added.)

Montgomery County's zoning ordinance,[10] as noted earlier, is codified in Chapter 59 of the County Code. Pursuant to § 59–C–9.3(c), landscape contracting is a use allowed in an RDT zone only with the grant of a special exception,[11] unless established as a legal nonconforming use. Before any special exception may be granted, the Board must find, by a preponderance of the evidence, that the proposed use

(1) Is a permissible special exception use in the zone.

(2) Complies with the standards and requirements set forth for the use in Division [12] 59–G–2.[13] *The fact that a*

---

**10.** For purposes of this opinion, "ordinance," "regulations," or "regulatory scheme" are used interchangeably, as apparently the General Assembly intended in its delegation of zoning powers to the County.

**11.** Section 59–A–2.1 of the Code defines "special exception" as:

The grant of a specific use that would not be appropriate generally or without restriction, which must be based on a finding that certain conditions governing special exceptions as detailed in Article 59–G exist, and that the use is consistent with the applicable master plan and is compatible with the existing neighborhood.

This definition mimics that found in Md.Code, Art. 66B § 1.00, the State enabling legislation for non-charter counties and municipalities granted zoning and planning powers.

**12.** For purposes of this opinion, we refer to the provisions of the Montgomery County Code as "sections."

*proposed use complies with all specific standards and requirements to grant a special exception does not create a presumption that the use is compatible with nearby properties and, in itself, is not sufficient to require a special exception to be granted.*[14]

13. Section 59–G–2 refers to § 59–G–2.30.00, which deals with landscape contracting specifically. It provides that:

This use may be allowed together with incidental buildings upon a finding by the Board of Appeals that the use will not constitute a nuisance because of traffic, noise, hours of operation, number of employees, or other factors. It is not uncommon for this use to be proposed in combination with a wholesale or retail horticultural nursery, or a mulch/compost manufacturing operation. If a combination of these uses is proposed, the Board's opinion must specify which combination of uses is approved for the specified location.

(1) The minimum area of the lot must be 2 acres if there are any on-site operations, including parking or loading of trucks or equipment.

(2) Areas for parking and loading of trucks and equipment as well as other on site operations must be located a minimum of 50 feet from any property line. Adequate screening and buffering to protect adjoining uses from noise, dust, odors, and other objectionable effects of operations must be provided for such areas.

(3) The number of motor vehicles and trailers for equipment and supplies operated in connection with the contracting business or parked on site must be limited by the Board so as to preclude an adverse impact on adjoining uses. Adequate parking must be provided on site for the total number of vehicles and trailers permitted.

(4) No sale of plant materials or garden supplies or equipment is permitted unless the contracting business is operated in conjunction with a retail or wholesale nursery or greenhouse.

(5) The Board may regulate hours of operation and other on-site operations so as to prevent adverse impact on adjoining uses.

(6) In evaluating the compatibility of this special exception with surrounding land uses, the Board must consider that the impact of an agricultural special exception on surrounding land uses in the agricultural zones does not necessary need to be controlled as stringently as the impact of a special exception in the residential zones.

14. The Planning, Housing, and Economic Development Committee of the County Council, sitting as the District Council, feeling that the "effect of the court cases [referring principally to *Mossburg v. Montgomery County*, 107 Md.App. 1, 7–8, 666 A.2d 1253 (1995) ] has been to shift the burden of proof in a special exception proceeding from the applicant to the community," recommended in 1999 adding this language purporting to address how the courts had to that time described the "presumption of compatibility" with regard to special exceptions, because the "Council's original understanding of a special exception

(3) Will be consistent with the general plan for the physical development of the District, including any master plan adopted by the Commission. Any decision to grant or deny a special exception must be consistent with any recommendation in a master plan regarding the appropriateness of a special exception at a particular location. If the Planning Board or the Board's technical staff in its report on a special exception concludes that granting a particular special exception at a particular location would be inconsistent with the land use objectives of the applicable master plan, a decision to grant the special exception must include specific findings as to master plan consistency.

(4) Will be in harmony with the general character of the neighborhood considering population density, design, scale, and bulk of any proposed new structures, intensity and character of activity, traffic and parking conditions, and number of similar uses. The Board or Hearing Examiner must consider whether the public facilities and services will be adequate to serve the proposed development under the Growth Policy standards in effect when the special exception application was submitted.

(5) Will not be detrimental to the use, peaceful enjoyment, economic value or development of surrounding properties or the general neighborhood at the subject site, irrespective of any adverse effects the use might have if established elsewhere in the zone.

(6) Will cause no objectionable noise, vibrations, fumes, odors, dust, illumination, glare, or physical activity at the subject site, irrespective of any adverse effects the use might have if established elsewhere in the zone.

(7) Will not, when evaluated in conjunction with existing and approved special exceptions in any neighboring one-

need[ed] to be restored." Ordinance 14–11; Zoning Text Amendment 99004 (16 November 1999).

family residential area, increase the number, intensity, or scope of special exception uses sufficiently to affect the area adversely or alter the predominantly residential nature of the area. Special exception uses that are consistent with the recommendations of a master plan do not alter the nature of an area.

(8) Will not adversely affect the health, safety, security, morals, or general welfare of residents, visitors, or workers in the area at the subject site, irrespective of any adverse effects the use might have if established elsewhere in the zone.

(9) Will be served by adequate public services and facilities, including schools, police and fire protection, water, sanitary sewer, public roads, storm drainage and other public facilities.

Montgomery County Code, § 59–G–1.21 (2009) (emphasis added).

Section 59–G–1.2.1 instructs that the Board, in acting on each special exception application, "must consider the inherent and non-inherent adverse effects of the use on nearby properties and the general neighborhood at the proposed location." Thus, the County Code does not endorse completely the distinction between inherent and non-inherent adverse effects in the review of special exception applications as discussed in our caselaw involving special exceptions. Moreover, § 59–G–1.2.1 defines "inherent adverse effects" as those involving "the physical and operational characteristics necessarily associated with the particular use, regardless of its physical size or scale of operations," and defines "non-inherent adverse effects" as those involving "physical and operational characteristics not necessarily associated with the particular use, or adverse effects created by unusual characteristics of the site." Our cases heretofore have not sought to define these terms, except as noted *infra.*

The County Code goes on to explain that, while "[i]nherent adverse effects alone are not a sufficient basis for denial of a special exception," "non-inherent adverse effects, alone or in

conjunction with inherent adverse effects, are a sufficient basis to deny a special exception." Montgomery County Code § 59–G–1.2.1 (2009). Finally, presenting a prima facie case meeting the County Code's standards and requirements applicable to specific special exception use does not ensure the approval of the special exception application. Rather, § 59–G–1.21(2) states that "[t]he fact that a proposed use complies with all specific standards and requirements to grant a special exception does not create a presumption that the use is compatible with nearby properties." [15] *See also* § 59–G–1.21(a) ("A special exception *may* be granted when the Board ... finds from a preponderance of the evidence ... that . . . .") (emphasis added).

## III.

## Analysis

**A. The County Zoning Ordinance's Treatment of the Presumption of Compatibility and Inherent and Non–Inherent Adverse Effects Associated with Special Exceptions Versus *Schultz* and Its Progeny**

This case involves the interplay between Maryland caselaw dealing with special exceptions,[16] and Montgomery County's

---

**15.** While no Maryland jurisdiction apparently goes as far as Montgomery County in this regard at present, there are other counties that purport, in their zoning regulatory scheme, to rein-in or endorse expressly some iteration of a presumption of compatibility as discussed in special exception caselaw. For instance, with respect to mining activities in the "Mineral Mining District," the Frederick County Code states that "compliance with or satisfaction of the criteria contained in this section shall not create a presumption of compatibility with nearby land uses. . . ." Frederick County Code § 1–19–100.400.2(A)(2). On the other hand, Wicomico County appears slightly less skeptical of the presumption of compatibility. *See* Wicomico County Code § 225–155 ("It is the duty of the Board of Appeals or Planning Commission to evaluate all such special exceptions herein authorized and to decide in each case, under the standards set forth below, whether or not each special exception does in fact meet *the Council's presumed compatibility* for the location and area in which it is located.") (emphasis added).

**16.** *See generally* Robert J. Carson, *Reclassification, Variances, and Special Exceptions in Maryland,* 21 Md L.Rev 306 (1961).

seemingly unique approach, as reflected in the County Code. To appreciate fully the apparent novelty of Montgomery County's zoning ordinance in this regard, we restate the history of special exceptions as a land use tool and the origin and purpose of the "presumption of compatibility" said to accompany them.

■ One treatise detailed aptly the origins of the special exception as a land use regulatory device:

> The creators of zoning designed a simple system. In principle, they believed that one ought to be able to look at a map and determine from that map exactly what could be done on a particular piece of property. For many types of uses . . . that system worked well; the zoning map created separate districts for each of those. Some uses do not fit so neatly into a map, however. These are uses that are generally compatible with the uses permitted as of right in a given district, but certain aspects of their implementation require scrutiny by the planning commission or other pertinent board before they are permitted. Certain uses may tend to generate excessive traffic, or attract a large number of people to the area, thereby creating noise or other pollutants. Similarly, the proposed special use exception may have a detrimental effect on the value of other properties in the area or may create a higher potential for accidents or other adverse effects on the public health or safety. . . . With traditional zoning, there were only two ways to address putting these uses into residential areas-either designating [them] as permitted uses in all residential zones OR granting "spot" zones for such uses at appropriate locations in residential neighborhoods. Clearly allowing such uses on every lot in a residential area was never an attractive alternative, and the early drafters of zoning legislation sought a simpler and more elegant solution. . . .

NYAL D. DEEMS ET AL., A PRACTICAL GUIDE TO WINNING LAND USE APPROVALS AND PERMITS, Ch. 2, § 2.05[3][a] (2010). In *Loyola College*, we reiterated the place of a special exception

as a device or tool in a comprehensive zoning regulatory scheme:

> The special exception adds flexibility to a comprehensive legislative zoning scheme by serving as a "middle ground" between permitted uses and prohibited uses in a particular zone. Permitted and prohibited uses serve as binary, polar opposites in a zoning scheme. A permitted use in a given zone is permitted as of right within the zone, without regard to any potential or actual adverse effect that the use will have on neighboring properties. A special exception, by contrast, is merely deemed *prima facie* compatible in a given zone."

*Loyola College*, 406 Md. at 71, 956 A.2d at 176. A special exception use "in a zoning ordinance recognizes that the legislative body of a representative government has made a policy decision for all of the inhabitants of the particular governmental jurisdiction, and that the exception or use is desirable and necessary in its zoning planning. . . ." *Mossburg v. Montgomery County*, 107 Md.App. 1, 7–8, 666 A.2d 1253 (1995).[17] The notion that a special exception is in a

---

**17.** In *Mossburg*, the Montgomery County Board of Appeals denied a landowner's request for a special exception to operate a solid waste transfer station, citing, *inter alia*, environmental concerns. *Mossburg*, 107 Md.App. at 13, 666 A.2d at 1259. In reversing the Board, the Court of Special Appeals noted that "there is absolutely no evidence, in respect to environmental concerns, that the environmental impact of the appellants' use at the subject site would be greater, or above and beyond, that impact elsewhere within the . . . zone. . . ." *Mossburg*, 107 Md.App. at 24–25, 666 A.2d at 1265.

The legislative history of the 1999 Zoning Text Amendment (ZTA) adding to the County Code much of the language pertinent to the present case reveals that *Mossburg* served as an impetus for the amendment. *See* Memorandum from Ralph D. Wilson, Senior Legislative Analyst, to the Montgomery County Council (9 November 1999) ("The effect of revising the standard for evaluating a special exception as contained in ZTA 99004 . . . is to replace the [*Mossburg*] method of measuring adverse effects against the same use at another location, with one that measures adverse effects only at the proposed location."). In this respect, the County was nine years ahead of the times, considering that, in *Loyola College*, we disavowed the necessity for a zoning body to undertake a comparative analysis such as suggested in *Schultz* and *Mossburg*.

certain context *"prima facie* compatible," or, stated different-
ly, that the use for which a special exception may be allowed
by a zoning regulatory scheme is "presumptively compatible"
generally with other uses permitted as of right in the same
zone, is not a wholly contemporary notion. *See, e.g., Creswell
v. Baltimore Aviation Serv., Inc.,* 257 Md. 712, 719, 264 A.2d
838, 842 (1970) ("A special exception is a use which has been
legislatively predetermined to be conditionally compatible with
the uses permitted as of right in a particular zone....").[18]

Tracing the origin of and the underlying rationale for a
"presumption of compatibility" concept/rationale, however,
proves a formidable task. The first Maryland case we could
find that appeared to discuss such a presumption is *Montgom-
ery County v. Merlands Club, Inc.,* 202 Md. 279, 96 A.2d 261
(1953). In *Merlands Club,* we considered the refusal by the
Board of Appeals of Montgomery County to grant a special
exception for a private recreational club. *Merlands Club,* 202
Md. at 282, 96 A.2d at 262. In discussing the special exception
provisions then found in the County Code, the Court stated
that the purpose of the provisions were "to delegate to the
Zoning Board a limited authority to permit enumerated uses
which the legislative body finds in effect *prima facie* properly
residential, absent any fact or circumstance in a particular
case which would change this *presumptive* finding." *Mer-
lands Club,* 202 Md. at 287, 96 A.2d at 264 (second emphasis
added). Similar early cases from this Court appearing to
discuss the presumption are to like effect. *See Gilmor v.*

---

18. Some states and local governmental subdivisions appear to recog-
nize that the legislative presumption of compatibility regarding special
exceptions does not extend to whether a discrete special exception
application actually is compatible with its specific neighbors. *See
Cambodian Buddhist Soc'y of Conn., Inc. v. Planning & Zoning Comm'n
of the Town of Newtown,* 285 Conn. 381, 941 A.2d 868, 900 (2008)
("[T]here is no presumption that a specially permitted use ... necessar-
ily is compatible with any particular neighborhood within the zoning
district."); *Delta Biological Res., Inc. v. Bd. of Zoning Appeals of the
City of Milwaukee,* 160 Wis.2d 905, 467 N.W.2d 164, 167 (App.1991)
("We reject Delta's argument because its linchpin, the presumption that
the conditional use serves the public interest, does not exist in Wiscon-
sin.").

*Mayor of Baltimore,* 205 Md. 557, 109 A.2d 739 (1954) and *Oursler v. Bd. of Zoning Appeals of Baltimore County,* 204 Md. 397, 104 A.2d 568 (1954). The seminal *Schultz v. Pritts* and the more-recent *Loyola College,* cited *supra,* are no more illuminating on the origins of the presumption. The only kernel of guidance we could find in Maryland caselaw regarding the origins or rationale for the presumption comes from our intermediate appellate court, which concluded that "[t]he presumption in favor of a [special exception] derives from the legislative policy determination that such a use is permissible. . . ." *E. Outdoor Adver. Co. v. Mayor of Baltimore,* 146 Md.App. 283, 308, 807 A.2d 49, 63 (2002). Yet, even assuming the presumption derives from the local legislative policy decision to provide in its original zoning regulatory scheme (or by amendment to its text) for the potential of such a use with the grant of a special exception, the use remains only permissible conditionally and each applicant must prove actually, to the satisfaction of the administrative decision-maker (subject to the narrow standards for judicial review and applicable constitutional principles), that his/her/its application will be compatible with the uses on (or future permitted use of) other properties in the neighborhood.

Perhaps the presumption of compatibility stems from a judicially-created inference assigned to the legislative body's decision to allow, in its zoning regulations, certain uses in certain zones by grant of a special exception. For instance, Professor Daniel R. Mandelker's treatise, "Land Use Law," looks to the Oregon Supreme Court's decision in *Archdiocese of Portland v. County of Washington,* 254 Or. 77, 458 P.2d 682, 685–86 (1969), for the presumption's rationale: "[T]he ordinance itself reveals the legislative plan. . . . The suspicion which is cast upon the approval of a change involving an incompatible use . . . is not warranted where the change *has been anticipated by the governing body.*" (emphasis added); *see* DANIEL R. MANDELKER, LAND USE LAW § 6.56 (5th ed.2003). That is, inherent in the essence of a special exception is a legislative determination that certain uses will be permissible (albeit with the grant of a special exception), notwithstanding

the likelihood of adverse effects naturally associated with such uses. *See* ARDEN H. RATHKOPF, THE LAW OF ZONING AND PLANNING § 61:8 (2010) ("The technique of the conditional use presupposes that some sort of legislative determination has been made as to which uses of property are allowable. . . ."). *But see Wells v. Pierpont,* 253 Md. 554, 559, 253 A.2d 749, 752 (1969) ("[T]he very fact of the granting of the special exception . . . presumes a determination by zoning authorities that the requested use would not be 'detrimental to the health, safety, or general welfare. . . .' ").[19]

Such thinking is consistent with most local zoning ordinances. For example, consider the Baltimore County Zoning Regulations ("BCZR") with which the *Loyola College* Court was faced. The BCZR provided a list of requirements that must be satisfied before any special exception may be granted (not to mention additional conditions for each special exception use). These generally-applicable requirements include, but are not limited to, a finding that the requested use will not "[b]e detrimental to the health, safety or general welfare of the locality involved; . . . [t]end to create congestion in roads, streets or alleys therein; . . . [or c]reate a potential hazard from fire, panic or other danger. . . ." *See Loyola College,* 406 Md. at 68, 956 A.2d at 174. Thus, the ordinance, on its face, states that if the applicant satisfies the final administrative decision-maker that it has met these standards, the special exception ought to be granted. *See* JOHN J. DELANEY ET AL., HANDLING THE LAND USE CASE; LAND USE LAW, PRACTICE & FORMS § 30:2 (3d ed. 2008) ("The distinguishing characteristic of the special-[exception] technique is that *if the administrative body . . . finds compliance* with the standards set forth in the regulation, the applicant has a right to the exception.") (emphasis added); 4 SOUTHWESTERN LEGAL FOUNDATION, INSTITUTE ON PLANNING AND ZONING 98 (1960) ("Many ordinances state that a use is subject to a conditional use permit[,]

---

**19.** The focus of the observation in *Wells* is directed to the decision to grant a specific special exception application, rather than the local legislature's purely legislative decision to allow in its ordinance a use only by the grant of a special exception

period."); *Ogden Fire Co. No. 1 v. Upper Chichester Twp.*, 504 F.3d 370, 382 (3d Cir.2007) (noting that a "special exception is not really an exception at all"). Stated differently, after meeting the criteria set forth in the ordinance, ordinarily it may be said that there is a presumption that this land use is compatible generally with permitted uses in the underlying zone. It is the caselaw that coins the presumption as such, as well as provides for the consideration of potential non-inherent adverse effects to rebut the now-shifted burden of production. *See Loyola College*, 406 Md. at 68–69, 956 A.2d 166, 175 ("Within each individual factor [of the Baltimore County Zoning Ordinance] lurks another test, the *Schultz v. Pritts* standard.").

 Another presumption—possibly working in tandem with the presumption discussed above—is the more general presumption "that zoning regulations reasonable in substance and reasonably applied do, or are presumed to, promote the public safety, health, morals, welfare and prosperity...." *Rockville Fuel & Feed Co. v. Bd. of Appeals of the City of Gaithersburg*, 257 Md. 183, 187, 262 A.2d 499, 502 (1970). The uses for which a special exception is required are conceptualized generally as having some deleterious effects on surrounding uses or undeveloped land in the neighborhood—or, stated differently, may be said potentially not to promote the public safety, health, morals, welfare, and prosperity and, therefore, are not appropriate to be allowed as uses of right. *See* JOHN J. DELANEY ET AL., *supra*, § 30:1 ("Most [uses for which a special exception is required] are regarded as potentially troublesome because of noise, traffic, congestion, or other associated problems."). The local legislature, however, determines that this potential may not be so tangible in every case as to warrant prohibition of the use in the zone or zones; rather, an applicant should be given the opportunity to satisfy an administrative decision-maker that in his/her/its case, such potential does not rise to the level of so likely or actual incompatibility as to rebut the presumption. Because the allowance of a special exception use is part of a comprehensive zoning regulatory scheme that is itself accompanied by the

presumption that it promotes public safety, health, and morals, it stands to reason that this broader presumption accompanying the zoning ordinance itself generates the specific presumption of compatibility associated with the inclusion in the ordinance of those uses that may be allowed through the grant of special exceptions. After all, a "presumption of compatibility" is nothing more than a rebuttable presumption that the intended use is in the interests of public safety, health, and welfare. *See Anderson v. Sawyer,* 23 Md.App. 612, 624–25, 329 A.2d 716, 724 (1974), *cert. denied,* 274 Md. 725 (1975) (referring to the presumption of compatibility as the "presumption *that the general welfare is promoted* by allowing funeral homes in a residential use district, notwithstanding their inherent depressing effects . . . .") (emphasis added).[20]

---

**20.** Maryland caselaw is replete with language suggesting, if not stating explicitly, that the presumption of compatibility associated with allowing a use by grant of a special exception and the presumption that a comprehensive zoning plan is in the interests of public safety, health, and welfare, if not one and the same, are related. In *Schultz v. Pritts, supra,* the Court discussed the applicable standard of review in special exception cases:

The special exception use is a part of the comprehensive zoning plan sharing the presumption that, as such, it is in the interest of the general welfare, and therefore, valid. The special exception use is a valid zoning mechanism that delegates to an administrative board a limited authority to allow enumerated uses which the legislature has determined to be permissible absent any fact or circumstance negating the presumption.

*Schultz,* 291 Md. at 11, 432 A.2d at 1325 (emphasis omitted); *Turner v. Hammond,* 270 Md. 41, 54, 310 A.2d 543, 550–51 (1973). Thus, it was the view of this Court in *Schultz* that the presumption that all parts of a comprehensive zoning scheme are deemed in the interest of the general welfare that was the impetus for the presumption of compatibility when certain uses are allowed by special exception, considering that special exceptions are a part of the comprehensive zoning scheme. *See also Handley v. Ocean Downs, LLC,* 151 Md.App. 615, 642, 827 A.2d 961, 977 (2003) ("By classifying a given use as a special exception use, the legislature, in essence, established a presumption that the use is consistent with the general welfare."); *Rockville Fuel,* 257 Md. at 190, 262 A.2d at 503 ("The legislative body . . . has in effect said that if certain standards and requirements . . . are met in a particular case, the various special exceptions specifically authorized are a part of the comprehensive zoning plan and therefore promote the health, safety, and general welfare, to the same extent as do the uses permitted as of right in the zone involved."); *Anderson,* 23 Md.App. at 624, 329 A.2d at

Merely concluding that the abstract presumption of compatibility accompanying the inclusion in a zoning ordinance of special exception uses—or the grant of a particular application for a special exception—derives from the general presumption that all parts of a comprehensive zoning scheme advance the general welfare, however, does not end our inquiry.

Following the 1926 Supreme Court progenitor case of *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), it became well settled in Maryland (and elsewhere) that enacting zoning ordinances and regulations was a legitimate exercise of the police power. *See, e.g., Wakefield v. Kraft,* 202 Md. 136, 141, 96 A.2d 27, 29 (1953) ("Such a[zoning ordinance], an exercise of the police power, enjoys a presumption in favor of its validity."); *Hoffman v. Mayor of Baltimore,* 197 Md. 294, 306, 79 A.2d 367, 372 (1951) ("A zoning statute, ordinance or administrative order, like other action in the exercise of the police power, is presumed to be valid. . . ."). Numerous courts hold that valid exercises of police power are accompanied by a presumption that such exercises are in the constituents' general welfare. *See Stringfellow's of N.Y. v. New York,* 91 N.Y.2d 382, 671 N.Y.S.2d 406, 694 N.E.2d 407, 414 (1998) ("[L]and use regulations generally enjoy a strong presumption of constitutionality as valid exercises of the State's police power to *advance the public health, safety and welfare. . . .* "); *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. City of Porterville,* 90 Cal.App.2d 656, 203 P.2d 823, 826 (1949) ("It is presumed that the enactment [of zoning ordinances] as a whole is justified under the police power and adapted to promote the public health, safety, morals, and general welfare."). Thus, it is reasonable to infer that the presumption of compatibility accompanying the local legislative decision to allow in its zoning ordinance the potential for certain uses in certain zones only through the grant of a special exception,

724 ("Indeed, it is precisely because of such inherent deleterious effects that the action of a local legislature in prohibiting such uses in a given zone or zones will be regarded as promoting the general welfare and as constitutionally sound.").

being a part of the general presumption that zoning ordinances are presumed to be in the general welfare, has roots sunk in the police power. Therefore, a presumption of compatibility is attributable to (1) the local legislative body's adoption of a comprehensive zoning scheme, *i.e.,* the zoning ordinance and zoning map; (2) the local legislative body's decision to allow in its ordinance for a certain use in a certain zone only with the grant of a special exception; and (3) the grant of a special exception application in a given case.

It is well settled that the General Assembly, and even local legislative bodies, may legislate "around" or even abrogate non-constitutional holdings of this Court regarding the interpretation of their legislative enactments, provided vested rights are not impaired and relevant and proper procedures are observed and, in the case of a local legislature, it has been delegated the authority to act in the particular legislative arena. *See State Admin. Bd. of Election Laws v. Calvert,* 272 Md. 659, 668, 327 A.2d 290, 295 (1974) ("[T]he General Assembly is the branch of government vested with legislative power, and that ... body at its periodic meetings by appropriate legislation can take steps to alter a decision of ours with which it may disagree....").[21] Because the police power serves as the basis for a presumption that a special exception, being part of a comprehensive zoning scheme, is in the general welfare, it is this same police power generally, and Md.Code, Art. 28 with regard to zoning and planning in Montgomery and Prince George's Counties, that allows local legislatures generally to craft their zoning ordinances as they deem appropriate (subject, of course, to the enabling statutes, due process, and other constitutional requirements, none of which are implicated in the present litigation). Less important to the present case than determining what *is* the origin and/or

---

21. In the "opinion" attached to Zoning Text Amendment No. 99004, the County Council, sitting as the District Council, noted that the "County Attorney advised that the broad power given the District Council is believed to be sufficient authority to regulate the basis upon which a special exception can be granted." Ordinance 14–11; Zoning Text Amendment 99004 (16 November 1999). We agree. *See* Regional District Act, Art. 28, §§ 8–101 *et seq.*

rationale underlying a relevant presumption of compatibility is determining what is *not* the origin and/or rationale underlying the presumption. Absent from the caselaw and treatises discussing presumptions of compatibility in the context of special exceptions is the notion that it—either explicitly or implicitly—is a creature of the Maryland General Assembly. Were it otherwise, a local legislature's efforts to blaze a different path than the General Assembly charted would be in doubt.

While this case is the Court's first opportunity to consider squarely the extent to which a local government, in enacting its zoning ordinance, is permitted to legislate standards for consideration of special exception applications different than discussed in *Schultz* and its progeny, our conclusion that it may do so is consistent with other opinions of both this Court and the Court of Special Appeals. In *Gotach Center for Health v. Board. of County Commissioners of Frederick County*, 60 Md.App. 477, 483 A.2d 786 (1984), an applicant for a special exception argued that the Frederick County Zoning Board applied improperly the standard for evaluating the adverse impacts of the proposed use as set forth in *Schultz* when the zoning ordinance directed the Board to apply the standard in *Gowl v. Atlantic Richfield Co.*, 27 Md.App. 410, 341 A.2d 832 (1975) (which *Schultz* overruled expressly).[22] While holding ultimately that the Frederick County ordinance

---

**22.** In *Gowl v. Atlantic Richfield Co.*, 27 Md.App. 410, 417, 341 A.2d 832, 836 (1975), the Court of Special Appeals held that adverse effects caused by a proposed use "ought to be measured against that which could arise under permissible use...." The local zoning ordinance in Howard County, at the time the application for bulk storage of petroleum products was denied by the board of appeals, required simply that, before a special exception would be approved, the board must find that the proposed use "would not menace the public health, safety, morals or general welfare of the community." *Gowl*, 27 Md.App. at 412, 341 A.2d at 833. The board, concluding that existing traffic and inadequacies/hazards in the roads around the subject property, augmented by an increase in traffic from the proposed use, foreclosed a favorable finding. *Gowl*, 27 Md.App. at 417, 341 A.2d at 836. The intermediate appellate court, agreeing with the Circuit Court, faulted the board's analysis, observing that the proper analytical comparison in

did not direct the board to apply a *Gowl*-type standard, Judge Alan M. Wilner, author of the *Gotach* opinion, wrote:

> All that *Schultz* seems to say is that, *absent some clear legislative direction to the contrary,* if a particular kind of impact is required to be taken into account in considering a special exception, the impact is to be measured by the test enunciated in *Schultz* and not by that stated in *Gowl. We see no reason, however, why a county legislative body cannot adopt a Gowl-type standard in the ordinance itself, if it chooses to do so.*

*Gotach,* 60 Md.App. at 485, 483 A.2d at 790 (emphasis added).[23] We hold today that the role played by the presumption of compatibility associated with a local legislature's election to provide in its zoning ordinance for allowing a use only through the grant of a special exception (or grant a particular special exception application), as discussed in the reported cases, applies in the absence of clear legislative intent to the contrary.[24] *See Mossburg,* 107 Md.App. at 21, 666 A.2d at 1263

---

which the board should have engaged was whether traffic from a permitted use on the subject property would have been worse than that which the special exception use might generate. *Id. Schultz* expressly disavowed the *Gowl* standard. *See Schultz,* 291 Md. at 5, 432 A.2d at 1322 ("We have determined that the standard established in *Gowl* is inappropriate....").

**23.** This language was quoted favorably in *Harford County v. Earl E. Preston, Jr., Inc.,* 322 Md. 493, 588 A.2d 772 (1991), a case in which an applicant for a special exception argued similarly that the Harford County zoning board erroneously applied a *Schultz* standard, instead of a *Gowl* standard, and that the county ordinance mandated the latter. Ultimately, as in *Gotach,* this Court held that "we find no intention on the part of the County Council [in its zoning ordinance] to substitute a *Gowl* test for the test applicable generally for measuring the adverse impact of a proposed special exception use which we adopted in *Schultz." Preston,* 322 Md. at 503, 588 A.2d at 777. Because the Court of Special Appeals and this Court, in *Gotach* and *Earl E. Preston, Jr., Inc.,* respectively, held that the standards set forth in the county ordinances did not mandate a non-*Schultz* standard, the language relevant to our query in the present case appeared there as dicta. It is our intention today to elevate this dicta to a holding.

**24.** This conclusion is in accord with various zoning and land use treatises discussing the presumption. *See* PATRICIA E. SALKIN, AMERICAN

("In the absence of a provision in a zoning statute clearly requiring a stricter standard than *Schultz*, *Schultz v. Pritts* applies.").

In addition to qualifying the application of the presumption of compatibility in a given special exception application, the County Code supplies definitions for "inherent adverse effects" and "non-inherent adverse effects," subjects upon which the caselaw is generally silent.[25] That is, it is well settled that

the appropriate standard to be used in determining whether a requested special exception use would have an adverse effect and, therefore, should be denied, is whether there are facts and circumstances that show that the particular use proposed at the particular location proposed would have any adverse effects above and beyond those inherently associated with such a special exception use . . . ."

*Schultz*, 291 Md. at 15, 432 A.2d at 1327. Nowhere in *Schultz*, however, or in any other Maryland reported case for that matter, is there express delineation of criteria for determining what adverse effects are "inherent," versus those that are not, with regard to a particular special exception use. If, as we hold, the County was free to enact a zoning ordinance within its delegated zoning and planning powers from the General

---

LAW OF ZONING § 14:12 (5th ed. 2010) ("Where a use is authorized upon issuance of a special [exception] subject to specified standards, *the courts* will presume that it serves the general public interest when located in the district.") (emphasis added); NORMAN WILLIAMS, JR. & JOHN M. TAYLOR, AMERICAN PLANNING LAW, LAND USE AND THE POLICE POWER § 148.04 (1985) ("These differences [in the amount of discretion zoning boards have in denying applications for special exceptions] may reflect the varying wording of the zoning ordinance involved—or more often, merely the preconceptions of the particular court.").

**25.** The Court in *Loyola College* undertook an analysis to "defin[e] what adverse effects are 'inherent' to a proposed use." *Loyola College*, 406 Md. at 104, 956 A.2d at 196. It did so, however, not to establish what effects are deemed "inherent" versus "non-inherent," but rather to determine whether a "comparative, multiple site impact analysis . . . to determine what adverse effects were in excess of those 'inherent'" to the proposed use is required. *Loyola College*, 406 Md. at 105, 956 A.2d at 197.

Assembly and consistent with constitutional inhibitions, *a fortiori* it should be able to enact amendments to its zoning ordinance to deal with issues on which this Court has been largely silent.[26]

In arguing that "[t]he Board of Appeals erred ... in construing and misapplying the 'inherent' adverse effects vs. the 'non-inherent' adverse effects standards in ... the Zoning Ordinance in light of *Schultz*[,]" Butler implies that the County Code's definitions of inherent and non-inherent adverse effects are, in some way, inconsistent with *Schultz* and its progeny. Assuming, *arguendo*, that the County Code's definition of "non-inherent adverse effects"—those involving "physical and operational characteristics not necessarily associated with the particular use, or adverse effects created by unusual characteristics of the site"—is inconsistent with what this Court has said previously while examining a different regulatory scheme than is before us now, we hold that the County Code's definition is an appropriate exercise of local legislative authority and discretion. We do not agree, however, with Butler's proposition that the County Code's definition—upon which the Board relied in denying Butler's application for a special exception—is inconsistent with what this Court said regarding non-inherent adverse effects. Rather, the County Code, in allowing the board to consider any

---

**26.** It is possible (if unlikely) that a local legislature, in determining which uses for which a special exception will be required, may document or catalog which discrete "inherent adverse effects" it considers to be attached to each use. *See Loyola College*, 406 Md. at 106, 956 A.2d at 197 ("[T]he local legislature puts on its 'Sorting Hat' and separates permitted uses, special exceptions, and all other uses."). Even then, we doubt that any such explicit consideration goes so far as to delve into issues of degree, intensity, or scope of the inherent adverse effects. It is more doubtful whether records of legislative history exist from which a reviewing court may say with any degree of certainty exactly which discrete adverse effects the local legislature deemed inherent, and which may have been deemed non-inherent, at the time the ordinance or amendment was enacted. We think that, rather than leaving courts to guess or assume what effects were deemed by the local legislature inherent in, say, landscape contracting, what Montgomery County has done, defining "inherent adverse effects" and "non-inherent adverse effects," is a reasoned approach.

"adverse effects created by the unusual characteristics of the site" is entirely consistent with *Schultz* and its progeny. We explain.

In *Schultz*, the Court wrote that an applicant for a special exception "does not have the burden of establishing affirmatively that his proposed use would be a benefit to the community. If he shows to the satisfaction of the Board that the proposed use would be conducted *without real detriment to the neighborhood* . . . he has met his burden." *Schultz*, 291 Md. at 11, 432 A.2d at 1325. The phrase "detriment to the neighborhood" implies necessarily that the Board's task is to determine if there is or likely will be a detriment to the surrounding properties. The Court did not mean that the Board, hypothetically, must measure and assess what the adverse effects of a proposed use would be on an idealized or even *average* neighborhood or property in the zone. Rather, as Judge Rita Davidson explained for the Court, it is for the zoning board to ascertain in each case the adverse effects that the proposed use would have on the *specific, actual* surrounding area.[27] *See id.* ("The extent of any harm or disturbance to the neighboring area and uses is, of course, material."); *Schultz*, 291 Md. at 15, 432 A.2d at 1327 ("[T]he appropriate standard to be used in determining whether a special exception . . . should be denied is whether there are facts and circumstances that show that the particular use proposed *at the particular location* proposed would have any adverse effects above and beyond those inherently associated with such a special exception use . . . .") (emphasis added); *Loyola College*, 406 Md. at 95, 956 A.2d at 191 (stating that the Court in *Bd. of County Comm'rs for Cecil County v. Holbrook*, 314 Md. 210, 550 A.2d 664 (1988), "highlighted characteristics of the particular neighborhood that exacerbated the problems inherent to the placement of a mobile home there"; and that "the *Schultz* analytical overlay for applications for individual

---

**27.** Such a conclusion is consistent with the lesson of *Loyola College*, namely, that "*Schultz* speaks pointedly to an individual case analysis focused on the particular locality involved around the proposed site." *Loyola College*, 406 Md. at 102, 956 A.2d at 195.

special exception is focused entirely on the *neighborhood involved in each case* "); *Sharp v. Howard County Bd. of Appeals,* 98 Md.App. 57, 83, 632 A.2d 248, 261 (1993) (stating that the Court, in *Holbrook* "construed the relative lack of vegetative screening between the two structures and the apparently level topography as sufficient localized circumstances that rendered the adverse property value impact, arguably always inherent in this particular use, uniquely adverse"); PATRICIA E. SALKIN, AMERICAN LAW OF ZONING § 14:14 (5th ed. 2010) ("The effect of a proposed use on its neighbors is a proper consideration in determining whether a special permit for such use will be granted."); NORMAN WILLIAMS, JR. & JOHN M. TAYLOR, AMERICAN PLANNING LAW, LAND USE AND THE POLICE POWER § 148.04 (1985) ("[T]he real question is, what about *this* proposed site?"). Accordingly, although we decline Butler's invitation to paint the prevailing County Code with a *Schultz*-colored "judicial gloss," even were we to accept that invitation, it would not be pleasing to Butler.

 One additional note is in order before we consider the record of the present case in light of the Board's decision. In a report relied on by the County Council, sitting as the District Council, in approving Zoning Text Amendment 99004, the County Attorney noted that "the courts have often failed to recognize the distinct differences between the enabling authority of a particular zoning ordinance and the individual use of specific zoning tolls by different zoning ordinances." Memorandum from Charles W. Thompson, Jr., County Attorney, to William E. Hanna, Jr., Chair of the County Planning, Housing, and Economic Development (29 September 2008). We agree with that observation. In reviewing a decision of a zoning board approving or denying an application for a special exception, the emphasis must be first and foremost on identifying the relevant and prevailing zoning ordinance. Only then, after determining whether the zoning ordinance is silent on the matters to which *Schultz* and its progeny speak, may the *Schultz* line of cases become pertinent and controlling.

## B. Applying the Prevailing Zoning Ordinance to the Evidence of Record in the Present Case

With this considerable prologue in mind, the narrow question now before us is whether there was substantial evidence in the record before the Board to support its conclusion that there were sufficient non-inherent adverse effects (as defined in the County Code) upon which to base the denial of Butler's application for a special exception.[28] In applying the substantial evidence test, "[t]he test is reasonableness, not rightness." *Layton v. Howard County Bd. of Appeals*, 399 Md. 36, 49, 922 A.2d 576, 583 (2007) (quoting *Annapolis v. Annapolis Waterfront Co.*, 284 Md. 383, 399, 396 A.2d 1080, 1089 (1979)). We conclude that there was substantial evidence from which the Board could determine reasonably that Butler's actual and proposed use would produce non-inherent adverse effects sufficient to warrant denial of the application for the special exception.

Before the hearing examiner (whose findings the Board relied on in rendering its decision denying the application), evidence was received regarding the relative narrowness of both Butler's lot and the surrounding lots in the neighborhood, including Weeks's lot. Because of this narrowness, the northern edge of Butler's property comes within twenty-two feet of Weeks's property line and forty-two feet of her residence. Further, the configuration of the uses on Butler's lot and the location of the driveway was such that trucks would need to backup as much as 130 feet from the driveway loop to the open storage area (accompanied by their beeping sound when operated in reverse). Many trees in the row of white pine trees bordering the property had lost lower branches, compromising their effectiveness for noise attenuation purposes.

---

28. At oral argument before us, Butler conceded that "there may, indeed, be a configuration of the property, perhaps, [that] would rise to the level of non-inherent" adverse effects, but argued that plateau had not been achieved on this record. In effect, Butler asks us to step in the shoes of the Board, the body best able to determine whether the configuration was such that the proposed use would have unique, non-inherent, adverse effects; we decline that invitation.

Butler's lot is not forested otherwise.[29] Thus, the Board was within reason to conclude that Butler's proposed use—deemed a "very intense and industrial commercial establishment"—would have unique, non-inherent adverse effects on adjoining properties in the immediate vicinity, within the meaning of § 59–G–1.2.1.

To be sure, considering that the County Code plainly allows landscape contractors to locate in residential areas in the RDT zone by special exception, such a special exception application cannot be denied simply because the lot upon which the proposed use will be located is adjacent to residences. The denial of the application, however, was supported by substantial evidence that the narrowness of Butler's lot, the configuration of the commercial enterprise activities and installations on the lot, and the proximity of the commercial activities to adjacent properties were sufficient non-inherent adverse effects to persuade the Board to deny the application. As this Court said in *Alviani v. Dixon*, 365 Md. 95, 113, 775 A.2d 1234, 1244 (2001): "[i]f the evidence makes the question of harm or disturbance or the question of the disruption of the harmony of the comprehensive plan of zoning fairly debatable, the matter is one for the Board to decide." If the issue of non-inherent adverse effects is at least fairly debatable, a reviewing court must defer to the judgment of the Board. Accordingly, we reverse the judgment of the Circuit Court for Montgomery County, and remand this case to that Court with direction to enter a judgment affirming the Board's decision denying Butler's application for a special exception.

**JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE DECISION OF THE MONTGOMERY COUNTY**

---

**29.** Additional tree plantings or fencing proposed by Butler, alone, did not sway the hearing examiner who concluded that, because of Butler's pattern of ignoring governing regulatory requirements, there was "substantial doubt that conditions [*e.g.* tree plantings, fencing, etc.] included in special exception approval can, even if otherwise protective of neighboring properties, be effectively enforced...."

BOARD OF APPEALS. COSTS TO BE PAID BY AP-
PELLEE.